The judgment and conviction are reversed and the prisoner discharged.

LANDON J., concurs.

## Court of Appeals.

*October*, 1886.

### PEOPLE *v.* JAEHNE.

BRIBERY — PENAL CODE — CONSOLIDATION ACT — CONFESSIONS — CORROBORATION.

The crime of bribery committed by a member of the common council of the city of New York, is punishable under section 72, Penal Code, providing for imprisonment for a term not exceeding ten years.

Said section 72 supersedes section 58 of the Consolidation Act, which provides for imprisonment for such offense, not to exceed two years.

The Penal Code, though enacted before the Consolidation Act, is, by section 2143 of the latter act, to have the same effect upon the Consolidation Act as if enacted after it. This provision, though anomolous, does not transcend legislative power, and subordinates the Consolidation Act to the Penal Code wherever the two statutes are in conflict.

A member of a common council, or other municipal officer, is a person who executes the functions of a public office, and mun'cipal officers are therefore within the provision of section 72, Penal Code.

· The Penal Code was intended as a revision of the prior. laws in respect to crimes and their punishment, and as a substitute for the scattered and fragmentary legislation which preceded it.

The general bribery act as contained in the Penal Code, covers the whole subject of bribery, and was intended to furnish the only rule governing the crime and punishment of said crime.

This case is within the rule that a later statute covering the same subject-matter and embracing new provisions, operates to repeal the prior act, although the two are not in express terms repugnant.

Section 725 of the Penal Code is to be construed as saving only those penal provisions of charter acts which are not covered by the provisions of the Penal Code.*

A confession to a police officer, which does not appear to have been made under the influence of fear produced by threats, or upon a stipulation for immunity from prosecution, is admissible under section 395, Code Criminal Procedure.

When in addition to the confession, there is proof of circumstances which although they may have an innocent construction, are nevertheless calculated to suggest the commission of the crime, and for the explanation of which the confession furnishes the key, the case cannot be taken from the jury for non-compliance with the requirements of section 395, Code of Criminal Procedure, as to corroboration.

It seems that under said section 395, the confession is to be treated as evidence of the *corpus delecti*, though insufficient without corroboration to warrant a conviction.

APPEAL from a judgment of the General Term of the Supreme Court of the first department affirming a judgment of the Court of Oyer and Terminer, New York county, convicting defendant of the crime of bribery.

The indictment was found in the General Sessions in March, 1886, and was thereafter ordered to the Oyer and Terminer for trial. The defendant was arraigned March 23, 1886, and pleaded not guilty.

---

* See dissenting opinion of RAPALLO, J., concurred in by EARL, J., as to above propositions.

The indictment was as follows.

"The grand jury of the city and county of New York by this indictment accuse Henry W. Jaehne of the crime of bribery, committed as follows:

"Heretofore, to wit, on the 29th day of August, in the year of our Lord one thousand eight hundred and eighty-four, at the city of New York, in the county of New York aforesaid, a certain petition and application of the Broadway Surface Railroad Company, a corporation duly organized and incorporated under and by virtue of the laws of the State of New York, before then duly presented to the common council of the city of New York, praying and making application to the said common council for its consent and permission to construct, maintain, operate and use a street surface railroad for public use in the conveyance of persons and property in cars upon and along the surface of certain streets, avenues and highways in the said city, together with the necessary connections, switches, sidings, turn-outs, turn-tables and suitable stands for the convenient working of the said work, was duly pending before and under the consideration of the said common council.

"And the said petition and application having been so as aforesaid made and presented to the said common council, and being so pending and under its consideration as aforesaid, the said Henry W. Jaehne, late of the city and county aforesaid, being then and there a public officer and a person executing the functions of public officer, to wit, an alderman and a member of the board of aldermen of the city of New York, and as such being then and there a member of the common council aforesaid, afterwards, to wit, on the said 29th day of August, in year aforesaid, and whilst the said petition and application was yet pending before and under the consideration of the said common council, contriving and intending the duties of his said office, and the trust and confidence thereby reposed in him, to prostitute and betray, at the city and county aforesaid, with force and arms, unlawfully, wickedly and corruptly did feloniously ask and agree to receive the sum of twenty thousand dollars in money, and a promise and agreement therefor from a certain person whose name is to the grand jury aforesaid as yet.

unknown, upon an agreement and understanding that the vote, action and official proceeding of him the said Henry W. Jaehne as such member of the said common council aforesaid, upon and concerning the said petition and application of the said Broadway Surface Railroad Company, so pending before and under the consideration of the said common council as aforesaid, should be thereby influenced, and that his vote, action and official proceeding as such member of the common council aforesaid, upon and concerning the said petition and application should be in favor of the granting and giving by the said common council of the consent and permission so as aforesaid in and by the said petition and application prayed and applied for, against the form of the statute in such case made and provided, and against the peace of the people of the State of New York and their dignity.

" *Second Count.* And the grand jury aforesaid by this indictment further accuse the said Henry W. Jaehne of the crime of bribery, committed as follows:

"Heretofore, to wit, on the twenty-ninth day of August, in the year of our Lord one thousand eight hundred and eighty-four, at the city of New York in the county of New York aforesaid, a certain petition and application of the Broadway Surface Railroad Company, a corporation duly organized and incorporated under and by virtue of the laws of the State of New York, theretofore duly presented to the common council of the city of New York, praying and making application to the said common council for its consent and permission to construct, maintain, operate and use a street surface railroad for public use in the conveyance of persons and property in cars upon and along the surface of certain streets, avenues and highways in said city, together with the necessary connections, switches, sidings, turn-outs, turn-tables and suitable stands for the convenient work of the said road, was duly depending before and under the consideration of the said common council.

"And the said petition and application having been so as aforesaid made and presented to the said common council, and being so pending and under its consideration as aforesaid,

the said Henry W. Jaehne, late of the city and county aforesaid, being then and there an alderman, and a member of the board of aldermen of the city of New York, and as such being then and there a member of the said common council, afterwards, to wit, on the said 29th day of August in the year aforesaid, and whilst the said petition and application was yet pending before and under the consideration of the said common council, contriving and intending the duties of his said office and the trust and confidence thereby reposed in him, to prostitute and betray, at the city and county aforesaid, with force and arms unlawfully, wickedly and corruptly, did feloniously accept from a certain person whose name is to the grand jury aforesaid as yet unknown, a promise and agreement to give and furnish to him, the said Henry W. Jaehne, the sum of twenty thousand dollars in money, and an undertaking to give and furnish the said sum of money to the said Henry W. Jaehne, under an agreement and understanding that the vote and action of him, the said Henry W. Jaehne, as such member of the said common council, upon and concerning the said petition and application of the said Boardway Surface Railroad Company so pending before and under the consideration of the said common council aforesaid, should be influenced thereby; and that his said vote and action should be given in the matter, cause and proceeding, of, upon and concerning the said petition and application in favor of the granting and giving by the said common council of the consent and permission so as aforesaid in and by the said petition and application prayed and applied for, against the form of the statute in such case made and provided, against the peace of the people of the State of New York and their dignity."

The following counsel appeared upon the trial:

*Randolph B. Martine*, district attorney (*De Lancey Nicoll* and *John R. Fellows*, assistants), for the people.

*John Graham*, *Richard S. Newcombe* and *Roger A. Pryor*, for the defendant.

The trial began May 10, 1886, before Mr. Justice BARRETT, at a term of the Court of Oyer and Terminer. A jury was not obtained until the evening of May 13, when the court placed the jury in custody of its officers and ordered that the trial days should be from 10 A. M. to 10 P. M., until trial ended, with usual recess for meals.

Mr. Martine opened the proceedings for the prosecution.

Mr. Pryor then moved that the prosecution elect upon which count of the indictment they will proceed, stating that it also appears that the two counts are upon different transactions. The first count alleges the asking and receiving, a promise or agreement to receive a bribe—that is to say, no agreement to give a bribe is alleged. The offense is consummated upon the asking or agreeing to receive a promise which may be made in future. The second count is on the allegation of the acceptance of a promise, that is the promise made, an agreement to receive a promise which may be made in future.

The COURT—The rule which I have invariably adopted, and it was the rule which I laid down in the Shaler case, which one of the learned counsel was in, is where the facts are set up in two or three different ways, and it is uncertain until the evidence is in, precisely which count it will be appropriate to proceed under, to reserve the point until the testimony is in. But where the two counts proceed under a different aspect of the law, and not under a different aspect of the facts, then I apprehend the position taken by the defense is the true one, and that the prosecution must, in reference to the development of their facts, be compelled to elect as to what provision of law they seek a conviction under. That being so, and there being here two distinct statutes, and not two distinct states of fact, I think it proper that they should elect as to which particular section or what particular law they are acting under or seeking a conviction under. I shall, therefore, grant the motion asked for by defendant.

Mr. MARTINE—In view of your honor's decision, we elect to go to trial upon the first count of the indictment under the Penal Code, section 72.

Mr. PRYOR—We submit a motion to dismiss the indictment,

or to direct an acquittal, upon the grounds that the district attorney having distinctly elected of record to proceed upon the count based upon section 72 of the Penal Code.

The court denied the motion, to which counsel for defendant excepted.

When the prosecution rested their case, a motion for a dismissal of the indictment was made, as follows:

Mr. GRAHAM—" I desire now, if your honor please, to move for a dismissal of the indictment on the ground that the grand jury were tricked into making a false presentment. When an indictment under the constitutional provision amounts to anything, it seems to me this court should be jealous in seeing that the grand jury are not permitted to use their oath without a proper function. When Inspector Byrnes went before that body he knew that Moloney was the briber if his testimony here is to be taken as true, and yet, for reasons which he would not state here, but which seem to be sufficient to his mind, he allowed the grand jury to act as though there was no evidence on the point of who was the briber. The reason of that is perfectly plain, and probably the facts will be developed on the defense. They could not indict Mr. McLoughlin as they wanted to indict him if he was the briber; and they could not indict Maloney as they wanted to indict him if he was the briber; and hence, with a view to get indictments against persons under which those persons could be held to bail in five and twenty thousand dollars, they kept the grand jury in the dark when they knew what the facts were as well as now, and induced that body to make a mendacious presentment. The constitution says that in a case of this kind no man can be tried except upon the presentment of a grand jury, and unless a grand jury is to be defrauded into making a presentment, and that doctrine is to be maintained in a court of justice, I submit that this is a fraudulent record, and that it is due to the dignity and majesty of the law that it should be quashed at this time."

The second ground of motion for a dismissal of the indictment was that sections 256, 257 and 258 of the Code of Criminal Procedure had been disregarded.

Mr. Pryor then argued in support of the motion made by Mr. Graham.

The COURT—"The first point is the one really before the court, and I do not care to hear the prosecution on it. I think the suggestion in reference to the first point that the grand jury were tricked into finding the indictment is a most extraordinary and unwarrantable one. On the evidence before us yesterday was not only the grand jury not tricked into finding it, but absolutely had taken into their entire confidence both the district attorney and the witness Byrnes, and of their own motion, in the interests of public justice, declined to require those additional details which have been produced here, and which, if they had been insisted upon before the grand jury, might have been subversive of public justice, so that the proposition is entirely unwarranted. The real question before the court is, whether the indictment was had after charging that the briber was a person unknown to the grand jury, when, as argued, the grand jury might have ascertained by insisting upon further inquiries who the person was. I think that proposition is equally untenable, and for the very obvious reason that the indictment was true, and has been proved here to be true. The person was unknown to the grand jury. The person is yet unknown to the petit jury. The proof here sustains the allegation of the indictment—*the proof* that the money was actually received from one Moloney does not prove that Moloney paid that money from his own pocket or made the agreement for himself. On the contrary, all the evidence tends to show that he was the agent and servant of the corrupt briber behind him, or the alleged corrupt briber behind him, and who that was, whether it was one or the other of the promoters of the scheme before the board; whether it was the corporation itself; whether it was the individual who Mr. Moloney mentioned in the confession testified to by Byrnes, namely, Sharp; or whether it was Richmond, or any of the other persons whose names we have heard here, we do not know. All we do know is, that William H. Moloney, who was a mere reader for the board of aldermen, is proved by the testimony of Byrnes to have been, if the confession made to him be true,

the person who handed the money for the briber to each of these aldermen. There is absolutely no evidence that Moloney. himself was the individual with the large amount of money who was doing this bribery; he was the end through which the unknown person is alleged to have bribed. The allegation is strictly correct, was well pleaded, and if the grand jury had been informed of the agent through whom the money had been paid, and of these various details and ramifications which have been placed before us, the indictment could not have been otherwise than it was, with accuracy. I deny the motion."

To which ruling counsel for defendant then and there duly excepted.

Mr. PRYOR—"I desire, if your honor please, to make another point. The allegation of the indictment is, 'city and county aforesaid, with force and arms wickedly, corruptly and feloniously did ask and agree to receive the sum of twenty thousand dollars in money, &c., whose name to the grand jury is unknown.' Thus the charge in the indictment, and the only charge in the indictment, is that this defendant did ask twenty thousand dollars, and did receive, or did receive a promise and agreement therefor from some person unknown. It is the request of the twenty thousand dollars and the receipt—not of the twenty thousand dollars—that is not alleged, but of a promise or agreement therefor. That is the allegation. I say, with great confidence, that there is not one scintilla of evidence in the case that that request was made or that promise received and accepted in the jurisdiction of this court. For aught that appears in this case, the request might well have been made in Kings county, and still have been received in Kings county and the county of New York; not one scintilla of evidence is there indicating when or where this request was made, or the promise to receive and accept it. Now, undoubtedly this court has no jurisdiction to try an offense committed out of the city and county of New York except upon a change of venue; but it is incumbent upon the prosecution affirmatively to prove beyond a reasonable doubt, as part of their case, that the offense was committed in the county of New York."

Mr. Pryor then cited People *v.* Porter (2 *Parker's Crim.*

*Rep.* 14), and moved an acquittal of the defendant upon the ground last stated.

The COURT—" The logic of this last argument is that the defendant cannot be convicted on circumstantial evidence, for if it be true that the prosecution must prove that the corrupt agreement was made in the city and county of New York otherwise than by the evidence which they have given to the court and jury, then they must prove by a witness in the city and county of New York, who heard the agreement made in the city and county of New York; that is the logic of the argument; they may, in my judgment, prove that the corrupt agreement was made in the city and county of New York, by circumstantial evidence; I see no reason why they should not prove that by circumstantial evidence as well as any other fact in the case, they have proved that every single act which was done under the alleged corrupt agreement was done in the city and county of New York, and they have proved, too, that the money was paid in the city and county of New York. I think under those circumstances it may fairly be left to the jury to say whether the understanding under which the money is alleged to have been paid, and is by the confession proved to have been paid, was not in the same locality as the place where the money itself was actually paid; I might even say that I think it would be rather a strained inference to say that the parties prior to the transactions went out of the venue to make their agreement and then came back into the venue to fulfill it. I deny this motion, too."

To which ruling counsel for the defendant then and there excepted.

Mr. Newcombe then opened the case on behalf of the defendant.

After the testimony on both sides was in, Mr. Graham summed up the case for the defendant, Mr. Fellows for the people, whereupon the court charged the jury as follows:

"GENTLEMEN OF THE JURY—I need not say to you that we are here to-night dealing with one of the gravest charges known to our law.

" There is no language adequate to express the abhorrence of the crime of bribery which every right-minded citizen should feel. It is, in truth, gentlemen, a crime against the very constitution of the state. It is a species of moral treason against the people. The crime of treason is a crime of physical violence against the State. The crime of bribery, if allowed to become general and to go unpunished, will be as efficient as violence to destroy the State. In other lands the despot has always sought to justify his methods by the pretence that the people needed his protection from their own corruption. This government of ours was founded upon the belief that the people have sufficient virtue in themselves to maintain free and popular government, and that they need no despot to preserve and perpetuate their institutions.

" You see, therefore, the absolutely vital importance in this form of government, of enforcing the laws against crimes which go to the very root of the social and political fabric—and of these, bribery is one of the most heinous. And so, gentlemen, you see that we have a very grave matter to consider to-night —grave to the people, grave to this defendant, for if he be guilty of a crime, such as I have characterized, his guilt is indeed atrocious; and if he be innocent of it, then indeed he ought to go free and no longer be under the ban of so terrible an accusation.

" Now, gentlemen, let us see for a moment how we ought to approach the consideration of such a case. We should approach it with every rule of law for the punishment of guilt and the protection of innocence clear in our own minds, with an honest and firm determination not to be swerved by prejudice, passion or clamor on the one side, nor to be perverted from our just conclusion by baseless insinuations upon the other.

" First, then, there is upon every criminal accusation (and naturally as much, if not more, where the accusation is of the present character), the presumption of innocence, until guilt is proved. That is one of the safeguards which surrounds the meanest criminal—he starts with the presumption of innocence until guilt is proved.

" And then, secondly, gentlemen, there is the doctrine that

no man shall be convicted unless his guilt is proved beyond a reasonable doubt. And what is reasonable doubt? It is the doubt which is born in fair and honest minds after a careful consideration of the evidence in the case; not a light or capricious doubt, not a doubt born of prejudice or indolence, or an unwillingness to do one's full duty, but the doubt which arises from the evidence. The doubt is not the property of the thoughtless juror who wishes to shirk his duty. It is the property of the defendant and of him only; and that because it is a reasonable doubt springing from the evidence.

" Then, thirdly, every defendant is entitled, the meanest and the poorest as well as the highest and the richest, to the benefit of counsel. The Court will always humanely appoint some gentleman of the bar to defend the man who has not a penny, and that gentleman must freely give the unfortunate his best services.

" Upon an indictment of the present gravity, the accused is entitled by his peremptory challenge to remove from the jury-box, if he so desires, twenty of the best and most intelligent jurors. The prosecution exercises the same right. Further, the defendant as well as the prosecution, may examine every juror to see that his mind is free from bias and free from any prejudicial opinion which may justly influence his consideration of the evidence and his final verdict. These are the safeguards which the law throws around the accused, but beyond all these is the great principle that he can only be convicted by the unanimous judgment of his twelve peers."

" Now, you see, gentlemen, that the law is humane and considerate. I have sometimes been asked, when pointing out these various bulwarks which have been erected by the people (in their wisdom) against wrong and oppression, ' but how is it possible ever to convict any one?'

" ' What,' says the inquirer, ' the presumption of innocence, the doctrine of reasonable doubt, the right to twenty peremptory challenges, and the unanimity of twelve minds drawn at hazard from the community? How is a conviction ever secured except in some very extreme cases?' My answer, gentlemen,

ever is, that the people who made these rules believed in the honesty and intelligence of the common people, from whom the jury is selected; that they relied upon the final judgment of the jury as they relied, in establishing their government, upon the general virtue of its citizens; and that they have faith that the jury would not be blinded by passion or prejudice, nor be perverted by any personal feeling or caprice, much less by want of intelligence or common sense. In other words, the people believe that while there cannot be too many safeguards thrown around the accused, yet in the end, if he be guilty, the eyes of twelve honest men cannot be blinded to the fact.

"The faith which originated and sustains the republic is thus impressed upon the criminal law—faith in the virtue of the people. Not, of course, in human perfection. There is the same human nature here as elsewhere, with all its weaknesses and fallibilities. There will be occasional miscarriages of justice. There will also at times be obstructions to justice in devious and wicked ways, but upon the whole justice generally triumphs and the virtue of the people may be relied upon. If that fails, all fails. But in my experience it rarely fails, and the good people in the end get things about right. I am one of those who believe in the system of jury trials in criminal cases just as it exists, with entire unanimity. No man should be convicted, except by the unanimous voice of his twelve peers.

"Here I think our forefathers were wise and we may well follow them. Now, gentlemen, let us come to the specific accusation in the present case.

"This defendant is specifically charged in this indictment [the court here reading from the indictment], with the offense of having asked and agreed to receive the sum of $20,000 in money and a promise and agreement therefor, from a certain person whose name is to the grand jury aforesaid as yet unknown, upon an agreement and understanding that the vote, action and official proceeding by him, the said Henry W. Jaehne, as such member of the common council aforesaid, upon and concerning the said petition and application of the said Broadway Surface Railroad company, so pending before and under the consideration of the said common council as afore-

said should be thereby influenced, and that his vote, action and official proceeding as such member of the common council aforesaid upon and concerning the said petition and application, should be in favor of the granting and giving by the said common council of the consent, etc.

"The charge there is not of having taken money by bribery. It is of the agreement to take and receive it. I apprehend, however, should you find that the defendant actually received the money it will not require any very serious deliberation to conclude that such receipt of the money was under some understanding that it should be so received. However, the substance of the indictment is the alleged corrupt agreement, not the receipt.

"Now, gentlemen, this charge may be proved in one of two ways. It may be proved by direct evidence, and it may be proved by circumstantial evidence. I think you will agree with me that it would be a very rare thing for us to find direct evidence of such an agreement. Of course such agreements are not made in open daylight; they are made in secret, and so if bribery is ever to be punished, it must generally be by circumstantial evidence. Now, that bribery should be punished is made known to us not only in a series of the severest laws on the statute books, but in a distinct provision of the constitution itself, showing the marked determination of the people to provide even in the fundamental law the antidote for this poison. Clearly, then, it may be proved by circumstantial evidence. As to the quality of this evidence, writers differ. Some think that direct evidence is the best and safest, others favor circumstantial evidence. The danger in the case of direct testimony is generally the possibility of perjury. In circumstantial evidence it is the possibility that the jury may draw erroneous or unjust conclusions from a group of facts truthfully testified to. In circumstantial evidence you are much less likely to find perjury than where the testimony as to the crime is direct. But the danger is of false inferences from the probably truthful chain of circumstances laid before the jury. In the present case you will see we have two classes of evidence. We have some direct evidence, and we have also some circum-

stantial evidence. Now; the law governing the case must be explained to you clearly.

There is in every crime what is called the *corpus delicti.* "You have heard this dwelt on very elaborately by the learned counsel. Now what is the *corpus delicti?* The body of the offense. I will explain it to you. In murder, it is death as the result, and the criminal agency of another as the cause. Where the dead body is found with evidences of violence, there is no difficulty. In larceny, *the fact* of the taking is the *corpus delicti.* What is the *corpus delicti* in a crime of the present character? 'A corrupt agreement,' says the pleader. ,Now, gentlemen, unless the corrupt agreement was in writing on a sheet of paper, it cannot be brought physically into court. You all know, as business men, that there are two kinds of agreements. There is what we call an express agreement, and there is what we call an implied agreement. You can bring an express agreement into court if it was in writing; and if it was verbal, you can bring the witness who was present and heard it made. But, gentlemen, you cannot bring an implied agreement physically into court. Yet it is none the less an agreement, none the less the *corpus delicti* of the alleged offense. It follows, gentlemen, that where the corrupt agreement is not express, but implied, it must be so implied from circumstances, and this must be proved, if at all, by circumstantial evidence.

"Now, the charge here is of a corrupt agreement or understanding. You can only bring an understanding into court by bringing the facts and circumstances from which the jury may infer it. Thus, there need not be direct evidence of the *corpus delicti* which is the corrupt agreement. If the jury believe, on all the evidence, that the corrupt agreement is made out, then the *corpus delicti* is made out. The only exception to the rule is the case of murder or manslaughter. There the *corpus delicti,* so far as the proof of death is concerned, must be made out by direct evidence, and circumstantial evidence as to the death is not sufficient.

"The Code reads as follows: 'No person can be convicted of murder or manslaughter unless the death of the person alleged to have been killed, and the fact of the killing by the defendant

as alleged are each established as independent facts, the former by direct proof and the latter beyond a reasonable doubt.'

"Even in murder, you see the fact of the killing by the defendant may be proved by circumstantial evidence. It is only the death which requires direct evidence, but that limited rule as to direct evidence in murder does not apply to any other offense.

"Bribery may be proved by circumstantial evidence wholly. In other words, the guilt of the defendant and the *corpus delicti*, may be proved by circumstantial evidence, and for the reason that I have suggested, that if the *corpus delicti* is an implied agreement, resulting from a group of facts, it is enough if the group of facts is sufficient to bring conviction of guilt to the mind beyond a reasonable doubt.

The next provision of the law to which I should call your attention is as to confessions. The confession of the defendant is not sufficient to warrant his conviction without additional proof that the crime charged has been committed. You will see, gentlemen, the wisdom of that. Many, many years ago men were executed on their confessions of murder, and yet subsequently the persons supposed to have been murdered actually made their appearance alive. So the judges laid down the rule that no man should be executed upon his confession of guilt unless the fact of the death was proved, and that is the reason we find this provision (as to direct evidence of death in murder) in our Code. It is certainly exceptional for innocent men to declare their guilt. But they have done so. There is no accounting for the occasional freaks of human nature. History and jurisprudence unite in the experience of such confessions by innocent men and of convictions founded upon them. So the law says that the prosecution must prove the *corpus delicti*, and must prove the guilt of the defendant by something more than his own confession. He cannot be convicted on that without additional proof that the crime charged has been committed.

"Now, what does that expression mean—'without additional proof that the crime charged has been committed.' That does not mean that you should strike out the confession altogether; that you are bound to find enough additional evidence that the crime

charged has been committed of itself, alone and unsupported, to justify a conviction—not at all. It is enough if, when you superadd to the confession the additional evidence (direct, if it be direct, circumstantial, if it be circumstantial), tending to show guilt, tending to the direction of guilt, there is sufficient when you put the two together (the confessions and additional evidence) to satisfy you of guilt. I try to put it plainly to you, gentlemen, but I will add an illustration of my meaning. If there was nothing whatever in this case but the confessions, I should direct you to acquit, because the law says you must not convict on confessions alone. And, further, if there were no confessions in the case, if there was nothing but this group of circumstances which has been laid before you, I might also direct you to acquit, because the circumstantial evidence, while you might think it tended in the direction of guilt, would not be sufficient, standing alone. But do the two together satisfy you of the defendant's guilt? Do the two together satisfy you as to the *corpus delicti*, namely, that there was a corrupt agreement or understanding such as is averred in the indictment, and that the defendant is guilty as charged?

"Now, in the law as it existed before the Code, that was also the rule. This Code is only a legislative affirmation of the sound existing principles on that head. Many years ago, when we had most eminent judges and a very great Supreme Court, as able a man as Chief Justice NELSON lays down the rule that evidence of confessions alone, unsupported by corroborating facts and circumstances is not sufficient to convict. There must be proof *aliunde* of the *corpus delicti*, although such proof need not be conclusive. 'Full proof of the body of the crime,' said the learned judge, 'independently of the confession, is not required by any of the cases, and in many of them, slight corroborating facts were held sufficient.'

"I do not mean to charge you, gentlemen, as strongly as that. I do not mean to say to you that slight corroborating facts will be sufficient. I tell you the corroborating facts ought to be convincing. That is, having heard these elaborate confessions (the last of which is claimed to have been verified by two witnesses) and then having heard the additional

evidence, namely, the chain of facts and circumstances, which, as the prosecution claim, tend clearly in the direction of guilt, you are to say, putting both together, whether your minds are satisfied of the defendant's guilt. Remember that you cannot convict on confessions alone. Remember, too, that the additional evidence by itself and standing alone is not sufficient. But you can convict upon the confessions, if the facts and circumstances which have been adduced in addition thereto, sufficiently corroborate them to satisfy you that the *corpus delicti* is made out, and the defendant guilty of the offense charged in the indictment.

We come now, gentlemen, to the conflict of fact. We have three witnesses for the prosecution testifying to the confessions. We have the defendant alone denying them. I am bound to say to you that there is no middle ground here for charity. Either the head of the detective bureau of police in New York has committed foul perjury, has constructed and made out of the whole cloth, a fabric of falsehood and has suborned two of his associates to assist him in the perpetration of his crime, or the denial of the defendant is untrue. You are the sole judges of these facts, and it will be for you to say who is to be believed.

"It is fair to ask you to inquire and consider whether this high officer had any motive sufficiently great to commit so foul a crime as perjury, to suborn two members of his force to assist him in its commission, and in doing so to attempt oppressively, wickedly and basely to crush this defendant. That is what it comes to. There is no room for saying, that in detailing as Inspector Byrnes did, an elaborate series of confessions covering a long period of time (of which he says he took notes, copies of which taken from the original memoranda he had in court), there was a mistake or misunderstanding as to what was confessed. The defendant says that the substantial part of the confessions was made out of whole cloth. Do you believe the defendant when he denies that testimony? He is here to be treated like any other witness, fairly, but of course he is here under the severe pressure of his present situation. It is claimed on the other side that the witnesses for

the prosecution, the three witnesses I speak of, are under some other moral pressure, some motive—what, I leave it to you to judge from the evidence, not from insinuations. You must take the evidence, if there is any, of motive and judge on the whole whether these three witnesses committed perjury, or whether the defendant has testified falsely in denying the substance of what they say. It is fair to say that the case for the defense presents the additional consideration (fully admitted upon the record) that this defendant was always in favor of a Broadway railroad, that he proclaimed it from the housetops; that he spoke of it when the bill which authorized municipal consent was before the legislature; that he repeatedly expressed the hope that this bill would pass, and declared that if it did he would vote for the franchise in the board. Upon this the argument is addressed to you that a man who so favored such a measure would be apt to vote for it from righteous motives, and that he would not be apt to make a corrupt agreement to favor what was in the line of his own inclination. That is a matter for your consideration, and I leave for you to say what weight is to be attached to it. But I deem it my duty to say, gentlemen, that if with all the desire in the world to have a Broadway railroad, with an expressed desire to have even this Broadway railroad, he still sold himself to the promoters of that enterprise, if in brief he made a corrupt agreement to receive twenty thousand dollars to influence his vote— then he is just as guilty as though he received the money to alter his purpose. The argument is a sound one that there is just as much bribery in being paid to perform one's duty as to violate one's duty.

"Now, gentlemen, what are the facts and circumstances which the prosecution claim tend to corroborate the alleged confessions and which they argue should satisfy you not only that the confessions testified to by Inspector Byrnes and the two officers are true, but that assuming them to be true, the *corpus delecti* and the guilt of this defendant are established.

"You have heard them. There is the fact that after the first aldermanic vote in favor of the franchise, the mayor of this city sent in a veto message to the board of aldermen, which

was read to and known by this defendant and in which reasons
for the veto were given.   It is true that the facts stated in that
message are not to be treated as facts, but simply as a notifica-
tion to the defendant of the reasons which actuated the mayor
in vetoing the aldermanic action and which that public officer
naturally hoped would have its due weight upon the board to
which it was addressed.

" Next we find that before the date when that veto could be
legally overridden, an injunction was served upon the members
of the board in substance restraining them from overriding it.
That was on the 25th of August, and the injunction was read
to the board.   The defendant thus had notice of it, and indeed
by a vote of the board it was sent to the corporation counsel
for his attention.   The corporation counsel did not appear in
the action, and it does not appear that he did anything with
regard to the suit, but what we do find is, that a firm of lawyers
acting (as Mr. Bright in his testimony said he inferred), for
the promoters of the scheme, purchased the discontinuance
of that suit, and the release of the plaintiff's claim for twelve
thousand five hundred dollars, which was paid in money.
This was done on the 29th of August, four days after
the service of the injunction.   The next regular meeting
of the board was to have been held on Monday, the 1st of
September.   The consent to the discontinuance of the injunc-
tion suit was handed to Mr. Bright, the attorney for the pro-
moters of the scheme, who were interested in the overriding of
the veto. Mr. Bright went that same night to a judge's house in
Brooklyn, and there obtained the judicial fiat to the discontin-
uance of the injunction suit.   We also find that Moloney, the
reading clerk of the board, went that same night to this defend-
ant (whether before or after the Brooklyn episode, we do not
know), and informed him that next morning at nine o'clock the
board would be free to override the veto.   The defendant him-
self told me this, as you remember.   That night the call for
that special meeting next morning at nine o'clock, was signed
(in part, perhaps in whole, with the exception of Waite), and
the next morning at nine, an hour so unusual that the board

never before or since has so met—the meeting in question was held. The signature of Waite (the eighteenth man necessary to make the requisite three-fourths) was affixed to the call for that meeting in the clerk's office fifteen minutes before the board met, namely, at about quarter to nine. So Waite says, and he is not substantially contradicted. It is true that Mr. Twomey said all the signatures were there, but I leave it for you to say whether there may not be a misunderstanding on his part as to Waite's signature. Waite says he could not have signed it any earlier, as he was in New London the day before and only came down that night in the train, reaching here about seven o'clock on the morning in question. Waite adds that he went directly from the train to the Brevoort House, there breakfasted, then came down town, passed through the lower hall of the rotunda of this building, there met the president of the Broadway Surface Railroad, Mr. Richmond, and the attorney, Mr. Bright, receiving the order of discontinuance from Mr. Richmond, and then passing on to the clerk's office of the board of aldermen, which he reached about a quarter to nine, and then and there affixed his signature to the call. It is claimed from this evidence that there was haste, undue haste, and secrecy. It is also claimed that the doors of the aldermanic chamber were shut. On that there is a question of fact which I leave for you to determine. At all events, the meeting was held and the veto was overridden. Then you have heard the series of facts and circumstances which occurred after that until the final overriding of the second veto.

"Now, gentlemen, it will be for you to say whether what took place on the 30th of August, the overriding of the first veto on that morning, with all that surrounds it, is or is not evidence of guilt sufficient to corrobate the confessions, and make you feel quite satisfied of the guilt of the defendant, or whether all that you have heard as to haste, unusual and early hours and the entire group of circumstances were merely evidences of zeal in the public service, or a desire on the defendant's part to do his duty and to do it promptly.

"The claim of the defense is that these facts and circumstances point not to corruption, but to zeal—the claim of the

prosecution that they point to darkness, secrecy, corruption and guilt.

"You are the judges of these facts, gentlemen, and you will decide where these facts point. The prosecution have given you these facts and these confessions. The defense has given you the evidence of the defendant's desire to have a railroad, the evidence that the railroad has been a good one for the public, that it is well equipped and well manned, that a great deal of money has been made by running it thus far, and consequently that the percentages to the city are, and probably will be, large. Beyond that, the only other evidence he gives us is his own firm, absolute denial of the confessions. This is the case.

"Now it will be for you to say, gentlemen, on that case, whether you do or do not believe this defendant to be guilty beyond a reasonable doubt. You were carefully selected. You remember the pains that were taken to secure a fair and honest jury. Everything has been done that could be done to secure a just result in this case. The defendant here is on trial, but so is the administration of justice. I believe I have done my full duty. I have faithfully endeavored to perform it. I have endeavored to be perfectly fair to this defense. I am not conscious of having ruled in one scintilla of evidence that they were entitled to have out, or ruled out one scintilla of evidence that they were entitled to have in. I have done my duty. You will do yours.

"I have nothing more to say to you than this: I cannot close my remarks without entering my solemn dissent from one proposition which was advanced by the defense. I solemnly dissent, while sitting on this bench, and with all the responsibility of my office, from the proposition that any kind of bribery can be a technical crime. I trust, gentlemen, that no such sentiment will ever find any lodgment in your minds or hearts. God grant that it may never find any lodgment in the hearts of our citizens. There is nothing trifling or technical in this abhorrent offense. As I said before, it is a substantial offense, even when committed in the very line of duty. Although the people may be enriched by a measure which was founded in corruption, we have not come to it yet

that, in our satisfaction in the end, we are to overlook or think nothing of the means.

"This defendant, gentlemen, is either innocent or guilty of this offense, which you are not to treat in the light of a technicality. He is either innocent and should be discharged because he has not committed this atrocious offense, or he is guilty of an offense which, in its nature and essence, is one of the worst kind known to our laws. It only remains, in conclusion, to say that if you conclude that this defendant is innocent, it will be your duty to say so. If you conclude that he is guilty, the form of your verdict will be, 'Guilty of the offense charged in the first count of the indictment."

Mr. NEWCOMBE—"I except to that portion of the charge in which your honor charged that the administration of justice was on trial."

Mr. GRAHAM—"I except to the direction that an implied agreement is a *corpus delicti* or may constitute a *corpus delicti.* I take the ground that it must be an express agreement.

"I take the exception that if the agreement is made out, the *corpus delicti* is made out. I take the ground that the intention is a part of the *corpus delicti.*

"I also except to the instruction that the facts in addition to the confession ought to be convincing. I also except to that part of the charge that additional evidence, what is enough, is for the jury.

"I also except to that part, if the jury believe the confession was made, but that the defendant's denial of the fact embraced in that confession is true, they cannot convict. I except to whatever the court said on that subject."

The COURT—"I do not think that I so charged, but whatever appears in the charge on that subject, the counsel will have the benefit of the exception."

Mr. GRAHAM—"I except to the direction that no bribery can be a technical crime."

The following are the requests to charge of one of defendant's counsel, Mr. Pryor, and the rulings of the court thereon:

*First.* Confessions are a doubtful species of evidence, and

should be received by the jury with great caution. People *v.* Ruloff, 3 *Parker*, 438.

The court so charged.

*Second.* The confessions of defendant, even if made as testified, are insufficient to warrant a conviction without additional proof that the crime charged has been committed. .

The court so charged.

*Third.* The defendant is not charged with receiving a bribe and cannot be convicted of receiving a bribe. The charge is that he asked or agreed to receive a bribe, or a promise of a bribe, upon an understanding or agreement that his vote and action in reference to the grant of the railroad franchise should be influenced by such promise. .

The court so charged.

*Fourth.* In order to find the defendant guilty of this charge, you must be satisfied by the evidence in the case that his guilt is shown beyond a reasonable doubt.

The court so charged.

*Fifth.* The fact that the crime charged was committed must be proved by evidence other than the confession of the defendant.

The court so charged.

*Sixth.* In order to render a verdict of guilty, you must find that the crime charged was committed beyond a reasonable doubt and upon evidence other than the confessions of the defendant.

The court so charged. .

*Seventh.* The confession of the defendant is no evidence that the crime charged was committed.

The COURT—"Not sufficient to warrant conviction without additional proof that the crime charged had been committed."

Mr. Pryor excepted to the refusal to charge as requested, and also to the modification as charged.

*Eighth.* The confession of defendant is evidence only of his connection with the crime charged, if you find that the crime was committed. .

The court so charged.

*Ninth* (first branch). If the jury believe that at the time the

indictment was found, the witness upon whose testimony it was found knew the name of the person alleged to be unknown, and that the grand jury were informed that the said witness knew the name of said person, there must be a verdict of acquittal.

The court so charged.

(Second branch). It is incumbent upon the prosecution to prove that the defendant committed the crime charged within the county of New York; and unless upon the evidence in the case the jury find the crime charged was committed in the county of New York, and so find beyond reasonable doubt, there must be a verdict of acquittal.

The court so charged.

*Tenth.* If the jury believe that the defendant made the confession testified to under the influence of a hope of escape, held out to him by Inspector Byrnes, then such confession is not evidence against him, and the jury must disregard it.

The COURT—"No. The evidence does not support the proposition."

Mr. Pryor excepted to the refusal so to charge.

*Eleventh.* If the jury believe that the defendant made the confession testified to under the influence of a fear produced by Inspector Byrnes that it would be the worse for him if he, the defendant, did not confess, then such confession is not evidence against the defendant, and the jury must disregard it.

The COURT—"No; I make the same remark as I did to the tenth."

Mr. Pryor excepted to the refusal so to charge.

*Twelfth.* The confessions of defendant are no evidence against him unless the jury believe that they were voluntary and uninfluenced by any fear produced by a person in authority that he would be in a worse condition as to the charge against him if he did not confess.

The COURT—"No; and I make the same remark as I did to the last proposition."

Mr. Pryor excepted to the refusal so to charge.

*Thirteenth.* If the jury believe that Jaehne had, before the Broadway application was made, declared his intention to vote for the measure, and such declaration had been generally an-

nounced and declared, it is a matter for them to consider in corroboration of his denial that any promise had been made to influence his vote.

The court so charged.

The following are the requests to charge of one of the defendant's counsel, Mr. Graham, and the rulings of the court thereon :

*First.* To convict under the first count of the indictment, the jury must find that the defendant did ask and agree to receive $20,000 in money, and a promise and agreement therefor, under an agreement and understanding that his vote, etc., should be thereby influenced as laid in this count.

The court so charged.

*Second.* That the jury must specify in their verdict, if they convict, whether it is of asking and agreeing to receive, or ask. ing or agreeing to receive $20,000 in money and a promise and agreement therefor, as stated in the indictment.

The COURT—"They are not bound to do so." Mr. Graham excepted to the refusal so to charge.

*Third.* The jury cannot convict the defendant under the first count of the indictment, as this case does not fall within section 72 of the Penal Code.

The Court refused so to charge. Mr. Graham excepted.

*Fourth.* The jury cannot convict the defendant of any offense, but under section 58 of the New York City Consolidation Act of 1882.

The court refused to so charge. Mr. Graham excepted.

*Fifth.* The evidence must show, to warrant a conviction, that the offense alleged against the defendant was, if at all, committed within the county of New York.

The court so charged.

*Sixth.* The defendant cannot be convicted, if when he took the consideration alleged in the indictment (if he did take it) his vote or action, in reference to the application before the common council, was then decided upon, was then determined upon and not in a condition to be influenced as the indictment alleges it was.

The court so charged.

*Seventh.* That this is emphatically so, if the jury believe that the defendant voted and acted, notwithstanding the consideration he is charged with having taken, as he had all along determined to do.

The court so charged.

*Eighth.* If the jury believe the defendant took the consideration laid in the indictment, before the application in question was pending before the common council, he cannot be convicted under the indictment.

The COURT—"No; but yes, if the consideration was not to influence an application which the parties agreed was to be made and was (pursuant to such agreement) made."

Mr. Graham excepted to the refusal so to charge as requested, and also to the modification as charged.

*Ninth.* That the same rule applies, if the jury believe he took the consideration charged after the application had been finally passed upon by the common council.

The COURT—"No; but yes, if the consideration was not paid subsequently as the culmination and fruition of the previous agreement to that effect."

Mr. Graham excepted to the refusal so to charge as requested, and also to the modification as charged.

*Tenth.* If the jury believe that the defendant took the consideration laid in the indictment after he had made up his mind finally as to his vote and action, and that he did not change or alter his vote or action on account of it, he cannot be convicted.

The COURT—"Yes, if this means that the money did not influence his vote or judgment as I suppose it means."

*Eleventh.* That the receiving the consideration laid in the indictment, for his vote or action was not an offense, unless coupled with an agreement or understanding that his vote or action should be influenced thereby.

The court so charged.

*Twelfth.* That the additional proof required that the crime charged has been committed, to make a confession a sufficient warrant for a conviction, must comprehend: 1. The asking

and agreement to receive, or accepting the consideration charged in the indictment. 2. And the agreement and understanding that the defendant's vote or action was to be influenced thereby. Without this the confession is not sufficient.

The COURT—"Yes; but the additional proof may be circumstantial, and it need not be sufficient to convict by itself and independent of the defendant's confession. The addition must be sufficient, however, to establish the *corpus delicti* and the defendant's guilt, beyond a reasonable doubt, when considered in connection with the confession."

Mr. Graham excepted to the refusal of the court to charge as requested and also to the modifications as charged.

*Thirteenth.* That the evidence offered by the defense as to the free, open expression and publication of what his vote or official action on the application before the common council would be, is to be considered by the jury on the question whether his vote or action was improperly influenced or not.

The court so charged.

*Fourteenth.* If the defendant practiced a deception in taking the consideration laid in the indictment, not meaning or intending to do what is charged upon him, he cannot be convicted under the indictment.

The court so charged.

The jury then retired at eleven o'clock, and returned into court at ten minutes past one o'clock P. M., and rendered a verdict of "*guilty of the offense charged in the first count of the indictment.*"

The defendant's counsel then asked that the jury be polled, which was done, when each juror answered in the affirmative. that that was his verdict.

On May 28, 1886, the court met, pursuant to adjournment. Mr. Martine moved for sentence upon the defendant.

Mr. Pryor then submitted two motions. *First,* in arrest of judgment upon the grounds—1. That the indictment is insufficient in substance. 2. That the count in the indictment upon which the verdict was returned is insufficient to sustain the verdict. 3. Because in law there can be no judgment upon the indictment and

verdict. 4. That said indictment is fatally defective inasmuch as it does not contain or set forth facts sufficient to constitute a crime. *Second.* For a new trial on two grounds—1. For misdirection to the jury in matters of law. 2. *Because the verdict is contrary to law and against the evidence.* The court denied both motions, and defendant took a separate exception to the denial of each motion.

The court then passed sentence upon the defendant, as follows: That he be confined at hard labor in the State prison for the period of nine years and ten months.

Thereafter and on June 22, 1886, the General Term of the First Department, composed of Justices BRADY, DANIELS and MACOMBER, affirmed said judgment, without opinion.*

---

* On a motion for a certificate and stay of proceedings, an opinion was rendered, of which a copy is given below, omitting those parts relating to points covered by the opinion of the Court of Appeals:

DANIELS, J.—"The elaborate argument that has been presented on behalf of the people, and also on behalf of the defendant, renders it in my judgment unnecessary to defer this case for further consideration in the disposition of this application. The application is made under the authority of section 527 of the Code of Criminal Procedure for a certificate that there are reasonable grounds to believe that the judgment will not stand, and for a stay of proceedings on that ground. Section 527 embodies those terms, and renders it necessary, before a certificate shall be granted, that it shall appear to the officer to whom the application is made, that there are reasonable grounds to doubt whether the judgment will stand.

It is not necessary for the disposition of the application to refer to either one of the authorities which have been presented in support of it, for the reason that the statute itself expresses the authority as clearly and distinctly as either one of these decisions have declared it. It is necessary, before a certificate shall be made, that there shall appear to be reasonable grounds for doubt in the case whether the judgment can be sustained. And it is on the disposition of the points made in support of the proposition that there is reasonable grounds of doubt, that the case is now made dependent.

The indictment charges the defendant with the crime of bribery, an offense that goes to the very foundation of the government itself, of the city, or of the State, of which the person indicted is an officer. It is important for the protection of the public, and the vindication of the laws, if

The following points, among others, were submitted by counsel on appeal to the Court of Appeals :

*Roger A. Pryor* and *Richard S. Newcombe,* for appellant.—
I. The crime of bribery committed by a member of the common council of the city of New York, is punishable by the Consolidation Act, and not by the Penal Code. The Penal Code was passed July 26, 1881. The Consolidation Act was passed July 1, 1882. By section 727, the Penal Code expressly provides that the Consolidation Act shall be deemed to have been enacted after the Code—as was the fact—and shall be unaffected by the Code. Therefore the Consolidation Act, as the later statute, supersedes the Penal Code, in

a person is properly convicted, legally convicted of an offense of this description, that the punishment shall follow the conviction as speedily as may be practicable after the disposition of the case at the trial. In other words, no unnecessary or needless delay should be allowed to intervene between the imposition of the sentence and its execution. This class of cases probably is more pressing under the exigencies presented for their speedy disposition than ordinary criminal prosecutions, for the reason already observed, that they relate to the fundamental institutions of the country. In view of the provisions of this section of the statute declaring when the certificate shall be made, and by implication declaring when it shall not be made, I will endeavor to consider the points that have been made by the counsel for and against the maintenance of this application.

The indictment is objected to upon two grounds. It has not been read, but it is to be assumed, by reason of the fact that but two objections have been made to it, that in other respects the indictment is free from fault. One of these objections is as to the allegation contained in it that this agreement, or promise, was made with a person whose name was unknown to the grand jurors. It, perhaps, is not necessary to determine, under the disposition which was finally made of the case at the trial, whether this would be a material defect in this indictment under the present provisions of the law. It is to be assumed as to the form of indictments now, that we have passed away from the doctrines inculcated and sustained by many of the decisions which have been made in England and in this and in other States. The Code of Criminal Procedure has now prescribed what an indictment shall contain And all that is necessary is that it shall give the name of the

so far as the two statutes are inconsistent. But, the Consolidation Act makes special provision for the crime of bribery by a member of the common council of the city of New York (§ 58); and defines the crime in different terms, and imposes a different penalty from that pronounced in section 72 of the Penal Code. Being of repugnant provisions, the two acts cannot stand together; and upon a familiar principle the former, the Penal Code, is superseded by the latter, the Consolidation Act.

But, by section 2143 of the Consolidation Act, "the Penal Code is to have the same effect as if it was passed after this act." Thus, the Penal Code prescribes that the Consolidation Act shall be deemed the later law; while the Consolidation Act provides that the Penal Code shall be deemed the subsequent

---

offense, and such a description of it as will enable the defendant to understand for what he has been indicted. Now, cases may arise where it would be naturally essential for the completion of the indictment, under these provisions of the Code, that the name of the individual who is affected by the crime should be stated in the indictment. Most, if not all, of the cases to which reference has been made were of this description. In a case of larceny, for instance, it is necessary, where the name of the owner can be ascertained by the grand jury, that it shall be stated, as well as the fact that the property belonged to the owner from whom it was taken. So, too, in the action that has been referred to, where the indictment was for selling or giving away intoxicating liquors to a slave. It is one of the essential features of the crime itself, in a case coming within either of these descriptions, that the name of the person shall be given in the indictment, in order to complete the statement of the offense, while in this case that same necessity does not appear to exist. The law has designated what shall constitute the offense charged, as against a person who is charged as the defendant in this case has been charged. And that charge and that offense consist in the promise to receive a bribe for the performance of official duties or services upon his part. And under these provisions of the statute, which have adopted different rules for determining the sufficiency of the indictment, and the case itself as it is also to be developed, the necessity does not appear to exist for alleging in the indictment the name of the person to whom the promise shall be made, or from whom the money may be expected to be received. In other words, that is not essential to enable the defendant to understand what he is charged with in the indictment. But without disposing of this

statute. If, in this conflict of provision, we accept the pre-scription in the last enacted statute, *i. e.*, the Consolidation Act, as the operative and obligatory mandate, then the Penal Code is the later law; and that law requires that the Consolidation Act shall "have the same effect as if enacted after this Code," and so again, we are conducted to the conclusion that the Penal Code is superseded by the Consolidation Act.

Section 58, Consolidation Act, defines the crime of bribery by a municipal officer in New York city in different terms and imposes a different punishment from that prescribed in section 72 of the Penal Code. But, despite this repugnance of provision, the two acts are not inconsistent; because the one is special and local and the other general in terms and operation. The Penal

---

part of the case upon this ground, it will be judicious to refer to what took place upon the trial, in considering what transpired before the grand jury. As the case was there submittted to the jury by the judge presiding at the trial, they were instructed to acquit the defendant if the name of this person could have been ascertained, or was known to the grand jury. The jury must be regarded, under that direction, as having negatived the ability of the grand jury to acquire knowledge of the name of the person with whom this agreement, or promise, may have been made, and therefore to have agreed in the finding that what was incorporated in the indictment, by this averment was true, that the name of the person was unknown to the grand jury. As to this objection taken to the indictment there seem, therefore, to be no reasonable grounds of doubt, under section 527 of the Code of Criminal Procedure, as to the obligation of the court to sustain the indict-ment and the conviction had upon it. . . .

"The evidence did also tend to show that the offense was committed within the county of New York; that whatever was done by the defendant for the purpose of committing this offense was necessarily done within the city It is reasonable to assume, from the circumstances that the charge related to a corporation existing in the city of New York, and to an enter-prise to be carried on and operated therein, that whatever negotiations took place, occurred within the county of New York. There was, at least, sufficient for the jury to determine that what transpired did naturally take place within the county, and therefore within the jurisdiction of the court. In this respect, the case is very clearly distinguishable from that to which attention has been drawn, where the indictment charged the offense

Code is an institute of criminal justice for the entire State and is operative upon persons generally; the Consolidation Act is of 'effect only in the city of New York, and the penal provision in question touches only the officers of the city. ·A posterior general act does not repeal a prior local or special act, unless the legislative intent to repeal be unequivocally apparent. People *v.* Quigg, 59 *N. Y.* 83; Matter of Del. and H. C. Co. 69 *Id.* 209; Village of Gloversville *v.* Howell, 70 *Id.* 287; Matter of Evergreens, 47 *Id.* 216; Matter of Goddard, 94 *Id.* 544.

That section 58, Consolidation Act, continues in force, and constitutes the law of bribery in the city of New York is not a matter of inference, but of positive and peremptory prescription by section 725, Penal Code.

---

of blasphemy. There was nothing in that case but the confession of the defendant himself. While here are these circumstances, these attendant circumstances, that relate to what would transpire in a case of this description, and they were in all probability located in the county of New York.

Under these circumstances the jury had reasonable grounds to infer that what took place did not occur in a foreign or other jurisdiction, but that it took place here, where the important features of the transaction were located, and where it would be probable, if unlawful means were intended to be used, that the corporation would develop the influences for bringing about the desired result. For these reasons it is not considered that the evidence was in any respect deficient for presenting the case to the jury, on the ground of any want of jurisdiction.

"In the disposition of the case at the trial, the court made the remark to the jury that the defendant alone was not on trial, but that the administration of justice was likewise on trial. While this is somewhat ambiguous, it would not ordinarily be supposed to convey the idea that the court intended the jury to understand that it was assumed that the defendant was guilty. It is true to a certain extent in all criminal cases, particularly in those relating to great public interests, that the administration of the law or the administration of justice is on trial. Criminal jurisdiction involves these two attributes; and if the execution of the criminal law is allowed to miscarry, it is a reproach to the administration of justice. And that was probably all that was designed to be indicated by the remark made by the judge, and all that the jury would understand from this remark. Reference is to be made to other portions of the charge, in which the judge laid down

If it be argued that by its terms section 725 applies only to statutes then existing, and that the Consolidation Act was an after enactment, we reply: *First,* that the objection, by assuming the subsequent enactment of the Consolidation Act, involves the conclusion that it supersedes the Penal Code; and, *secondly,* that when the Penal Code was passed, the New York charter of 1873 (*Laws* 1873, chap. 335) was in existence, and contained (section 100) the identical provision against bribery found in section 58 of the Consolidation Act. This provision, then, was continued in force by section 725, Penal Code.

People *v.* N. Y. Catholic Protectory (38 *Hun,* 127), is an authority to the point. There the question was whether the Penal Code or the Consolidation Act gave the law of the case. Adverting to a diversity in the provisions of the Penal Code and the Consolidation Act, the learned judge says: "By no construction can this provision of the Penal Code repeal the provisions of the act of 1863, inserted in and made a part of the Consolidation Act of 1882; for one act of the legislature is not allowed to repeal another by implication when both can

---

and enforced upon the attention of the jury the rules which were necessary to be observed, for the purpose of determining and properly disposing of this objection. They were admonished to take the case cautiously, and to look at it carefully, in view of the legal principles that seemed to be applicable to it. And this remark could not have been understood by them as withdrawing from their attention, or province, the obligations and duties indicated by what was otherwise said by the judge in presenting the case to them.

"These considerations lead to the conclusion that this case was properly tried and that there is no reasonable ground to suppose that this judgment cannot be sustained. It is not necessary to determine these questions definitely, and they are not now so determined, but simply as to what are the legal indications from the facts and the authorities presented for consideration in support of the application that is now made.

"The conclusion reached, and which seems to enforce itself upon the mind by the considerations to which attention has been drawn, is that this judgment is not one of such a character as to present reasonable doubts as to whether it shall stand. And under these circumstances it is the duty of the court to deny this application for a stay."

be maintained and enforced together as these several statutory directions very clearly can be. Hankins *v.* Mayor, 64 *N. Y.* 18, 22. . . . The provisions contained in the Consolidation Act are local and special, while that made by this subdivision of section 291 of the Penal Code, is general, and it is a rule of construction that 'a special statute providing for a particular case or applicable to a particular locality, is not repealed by a statute general in its terms and application, unless the intention of the legislature to repeal or alter the special law is manifest, although the terms of the general act would, if taken strictly, and but for the special law, include the case provided for by it. Van Denburgh *v.* Village of Greenbush, 66 *N. Y.* 1, 3, 4. Under this rule, also, the special provisions on this subject should still be maintained.

The conclusion is unavoidable that § 72 of the Penal Code gives way to § 58 of the Consolidation Act; that the latter provision alone constitutes the law of the case, and that the count upon which the conviction was had, being framed upon the previous statute, the judgment must be reversed. "A later statute in the affirmative shall not take away a former act; and *eo potius* if the former be particular and the latter general." Gregory's Case, 6 *Coke*, Part 6, p. 19. " General legislation on a particular subject must give way to special legislation on the same subject." State *v.* Mayor, 33 *N. J. L.* 61 ; State *v.* Branin, 3 *Zab.* 484 ;. People *v.* Quigg, 59 *N. Y.* 88. " When the legislature pass a particular act, and declare under what circumstances, in what manner, and to what extent individuals shall be liable under that act, the intendment is that they are liable under those provisions only, and do not fall within the provisions of former general acts. Subsequent general acts, although their language is sufficiently broad and comprehensive for such purpose, will not control the provisions of prior special statutes unless the legislature so intended." Rochester *v.* Barnes, 26 *Barb.* 662 ; Plank Road Co. *v.* Allen, 16 *Id.* 15 ; Werner *v.* German Savings Bank, 2 *Daly*, 406 ; Ferry *v.* Bank, 15 *How.* 450 ; Comm. *v.* Kimball, 21 *Pick.* 375 ; *In re* Goddard, 16 *Id.* 504 : *Dillon on Mun. Corp.* § 54, note 1. "If the legislature manifests an unmistakable intent that the county

of New York is an exception to the general law," that law does not apply. Hankins *v.* Mayor, 64 *N. Y.* 21. "If the subsequent statute be not repugnant to a prior one, yet if the later one was clearly intended to prescribe the only rule that should govern in the case provided for, it repeals the original act." *Sedgw. on Stat. and Cons. Law,* 124. "If the provisions of a special charter or a special authority, derived from the legislature, can reasonably well consist with general legislation whose words are not absolutely inharmonious with it, the two are to be deemed to stand together; one as the general law of the land, the other as the law of the particular case. State *v.* Stoll, 17 *Wall.* (*U. S.*) 425; Townsend *v.* Little, 109 *U. S.* 504.

Again, section 726 is a clause of repeal, and since a repeal is possible only of a statute then in existence, and since the Consolidation Act was not in existence when the Penal Code was passed, it follows necessarily, that the Consolidation Act is unaffected by section 726.

II. The evidence discloses facts which the prosecution claims establish that the defendant confessed that he *was bribed.* The count of the indictment under which conviction was had charges the defendant with *agreeing to receive a bribe.* The judge's charge says: "Defendant is charged with the offense of having asked and agreed to receive the sum of twenty thousand dollars in money, and a promise and agreement therefor, from a certain person whose name is to the grand jury aforesaid as yet unknown, upon an agreement and understanding that the vote, action and official proceeding of defendant should be influenced," &c.; and again, the charge is not of having taken money by bribery, but "of the agreement to take and receive it." All the evidence simply tended to prove acknowledgments by admissions of the receipt of a bribe, but in no manner tended to prove any promise to pay or to receive. There was *no* evidence of *any promise* to vote for the franchise—for any consideration—no evidence of any promise to vote—or any promise to receive money. The only evidence is that of Byrnes and his two officers that defendant said he *had* received money. If he received it without a promise or

agreement, after the vote, it was not a crime. Defendant was indicted for agreeing to receive.

By section 395, Code of Criminal Procedure, the confession of the defendant "is not sufficient to warrant a conviction, without additional proof that the crime charged has been committed." The words "without additional proof" are ambiguous, and may mean either evidence of the *corpus delicti* additional to *such* evidence in the confession, thus making the confession competent evidence of the *corpus delicti*, or may mean that a confession is insufficient to convict without evidence in addition of the *corpus delicti*, *i. e.*, that the confession shall be evidence only of defendant's criminal agency, and requiring other, independent evidence of the criminal act. But it is a familiar canon of construction that, without an unequivocal manifestation of the legislative intent to abrogate the common law, the common law is unaffected by a statute provision. Now, by the common law rule prevalent in the United States when the Criminal Code was adopted, a confession was no evidence of the *corpus delicti*, but only of the connection of the defendant with the crime. The *corpus delicti* must be established by evidence independently of the confession. State *v.* Guild, 5 *Halsted*, 163; State *v.* Dubois, 54 *Iowa*, 363; May *v.* State, 92 *Ill.* 343; Pitts *v.* State, 43 *Miss.* 472; Gray *v.* Commonwealth, 101 *Penn. State*, 386; Priest *v.* State, 10 *Neb.* 393; U. S. *v.* Searcey, 26 *Fed. Rep.* 435; Hope's Case, 1 *City H. Rec.* 150; People *v.* Badgley, 16 *Wend.* 53; People *v.* McGloin, 91 *N. Y.* 242; *Wharton's Crim. Law*, § 633; *Bishop's Crim. Law*, § 1071; 1 *Greenl. on Ev.* § 271.

Conceding, for argument, that the confession was competent evidence of the *corpus delicti*, still the "additional evidence" is insufficient to warrant the conviction. The corroborative evidence must go to prove the entire crime, and not only one or more of its constituent elements; and proof of one element is no proof of another. People *v.* Plath, 4 *N. Y. Crim. Rep.* 53; 100 *N. Y.* 590. "There must be some fact deposed to independently altogether of the evidence of the accomplice, *which, taken by itself*, leads to the inference not only that a crime has been committed, but that the prisoner is implicated in it."

People *v.* Plath, *supra.* "Such evidence as merely raises a suspicion of guilt is insufficient to satisfy the requirement of section 399; the evidence must carry conviction to the minds of the jury." People *v.* Williams, 1 *N. Y. Crim. Rep.* 344. "The corroboration of any witness needing support, ought to be by some fact, the truth or falsehood of which goes to prove or disprove the offense charged." Frazer *v.* People, 54 *Barb.* 310.

The additional evidence here, if any, being purely presumptive, it is important to bear in mind the principles by which the probative force of circumstantial evidence is determined and measured. People *v.* Kennedy, 32 *N. Y.* 145. "All proof must begin at a fixed point. The law never admits of an inference from an inference. Two imperfect things cannot make one perfect. . . . The circumstance itself, from which the inference is to be drawn, is never to be presumed, but must be substantially proved; for who can prove one doubtful thing by another?" *Phillips' Theory of Presumptive Proof; Lawson on Presumptions,* 569. "To take presumptions, in order to swell an equivocal and ambiguous fact into a criminal fact, is an entire misapprehension of the doctrine of presumptions." Evans *v.* Evans, 1 *Hagg. Con. R.* 105. "In determining a question of fact from circumstantial evidence, there are two general rules to be observed: *First,* the hypothesis of guilt should flow naturally from the facts proved, and be consistent with them all; *second,* the evidence must be such as to exclude, to a moral certainty, every hypothesis but that of his guilt of the offense imputed to him; or in other words, the facts proved must all be consistent with and point to his guilt not only, but they must be inconsistent with his innocence." People *v.* Bennett, 49 *N. Y.* 105; People *v.* Stokes, 2 *N. Y. Crim. Rep.* 382. "If the facts be consistent with innocence, they are no proof of guilt." Ormsby *v.* People, 53 *N. Y.* 475; People *v.* Courtney, 28 *Hun,* 593; Frazer *v.* People, 54 *Barb.* 309; Comm. *v.* Holmes, 127 *Mass.* 424. "Conduct being susceptible of two opposite explanations, we are bound to assume it to be moral rather than immoral." Port *v.* Port, 70 *Ill.* 484; Mason *v.* State, 33 *Ark.* 239; Carroll *v.* Quynn,

13 *Md.* 379. "Where the facts of a case are consistent with honesty and dishonesty, a judicial tribunal will adopt the construction in favor of innocence." Greenwood *v.* Lowe, 7 *La. Ann.* 197. "If a fair construction of the acts and declarations of an individual do not convict him of an offense—if the facts may all be admitted as proved, and the accused be innocent, should he be held guilty? He may be guilty, but he may be innocent." U. S. *v.* The Brig Burdett, 9 *Peters (U. S.)* 682; see, also, Frazer *v.* People, 54 *Barb.* 306.

"When a specific intent is required to make an act an offense, the doing of the act does not raise a presumption that the act was done with that intent." *Lawson on Presumptions*, 271; People *v.* Plath, *supra.*

IV. If, however, a crime be proved, still, there is no proof of the venue as laid in the indictment. The law is fundamental and familiar that the prosecution must prove, by affirmative and sufficient evidence, that the offense was committed in the county of indictment and trial. "All crimes are local, and the prosecution for them can be carried on only in the county of their commission." 1 *Bish. Crim. Pro.* § 49. "While it is necessary for the indictment to state the county in which the offense was committed, the proof must also affirmatively sustain this allegation." *Id.* § 384. "In all cases it is material to prove that the offense was committed within the county where it is laid and where the trial is had, the jurisdiction of the court being limited, in criminal cases, to that county." 3 *Greenl. on Ev.* § 12; 2 *Hawkins Pl. Cr., C.* 25, § 84; *Archb. Cr. Pl.* 40, 95; 1 *Stark Ev.* 466. A new trial may be awarded for want of proper proof of the venue. Holman *v.* State, 13 *Ark.* 105; Sewell *v.* State, 6 *Yerger,* 364; Hoover *v.* State, 1 *West Va.* 336. So, a special verdict to sustain a judgment, must find affirmatively that the offense was committed in the county. Comm. *v.* Call, 21 *Picker.* 509; Rex *v.* Hazel, 1 *Leach,* 4th ed. 368. "Even if there were legal evidence to prove a crime committed, the confession does not show that the blasphemous words were spoken within this county or State." People *v.* Porter, 2 *Park. Cr. R.* 15; Larkin *v.* People, 61 *Barb.* 226; see, also, case of the Seven Bishops, 12 *Howell St. Tr.* 183.

V. The court erred in refusing to strike out the testimony of Byrnes in proof of the confession; or, if the motion were too late, in admitting the evidence of Rogers.

"A confession obtained by either threats or promises, from any one having authority over the accused or concerned in the administration of justice, is uniformly held to be inadmissible." People *v.* McMahon, 15 *N. Y.* 386. "If the words used are ambiguous, but might be considered by the party charged as a threat or a promise, it seems the confession will not be admitted. 1 *Phill. on Ev.* 461. "If the threat or inducement is held out, actually or constructively, by a person in authority, it cannot be received, however slight the threat or inducement, and the prosecutor, magistrate or constable is such a person. R. *v.* Moore, 5 *Cox C. C.* 555. Where the defendant made confessions of guilt under the influence of threats of arrest for the crime of which he was then and there accused, or to an officer upon promises of escape if he would confess, *held*, that such confessions were inadmissible. People *v.* Ah How, 34 *Cal.* 218. A confession to a magistrate before examination, on his saying "it would be better for the accused to make a full confession," *held*, inadmissible. People *v.* Ward, 15 *Wend.* 231; Comm. *v.* Nott, 29 *Alb. L. J.* 97; S. C. 135 *Mass.* 269; State *v.* York, 37 *N. H.* 175; R. *v.* Partridge, *C. & C.* 551; R. *v.* Shepherd, 7 *Id.* 579; R. *v.* Coley, 10 *Cox C. P.* 536; R. *v.* Kingston, 4 *C. & P.* 387. The present terms of the statute import the full sense of the common law rule; the modification of phraseology is only to avoid a pleonasm; and the law still is, that a promise of benefit from a confession makes it incompetent evidence.

Independently of the strict rule of law invalidating a confession, it is a grave question whether the courts will sanction the device by which the inspector of police entrapped the defendant. The maxim is *nemo tenetur seipsum accusare;* and, it was not within the competency of the court, with all its power, to compel the defendant to an inculpative admission. *N. Y. Const.* art. 1, § 6.

VI. The learned judge erred in admonishing the jury that

"the defendant here is on trial; *but so is the administration of, justice.*"

Another judge, of a very different character from the able and upright magistrate whose incautious utterance we venture to criticise, namely, Chief Justice SCROGGS, once in a summing up advised the jury "to make this case a public example, (Beaseley's Case, 1 *Phillip's State Trials,* 325), and the remark is challenged by all authorities as a fatal usurpation upon the functions of the jury. See Frazer *v.* People, 54 *Barb.* 310.

VII. Section 72 of the Penal Code does not apply to a member of the common council. A careful reading of chapter I of title VIII, containing section 72, fully sustains the view that the legislature only intended to provide a punishment for crimes against *public justice* or its administration, as the title of the act indicates, and all the sections contained in chapter I of title VIII, refer either to jurors or the drawing of them, or to witnesses, or to some one directly concerned in the administration of justice. The previous title, *i. e.,* VII, refers to crimes against the *legislative power,* and it is here that one would expect to find some provision respecting the bribery of a member of the common council, whose duties are legislative, and not *judicial* in their character. The legislature has in this title only provided for bribery of members of the State legislature; nothing is said about municipal legislators. Now in 1882 the legislature, recognizing the fact that in the Penal Code they had omitted to provide for bribery of a member of common council, passed the Consolidation Act which expressly provides for bribery of a member of the common council of the city of New York.

*Randolph B. Martine,* district attorney, and *De Lancey Nicoll* (assistant), for respondent.—I. The Penal Code was passed on the 26th day of July, 1881. By section 727, it was to take effect on the 1st day of May, 1882, and it was further provided in the same section that "when construed in connection with other statutes it must be deemed to have been enacted on the 4th day of January, 1881, so that any statute enacted after that day is to have the same effect as if it had been enacted

after this Code." By an amendment, chapter 102 or the laws of 1882, passed April 28, 1882, the date of its taking effect was postponed to December 1, 1882. The New York City Consolidation Act, chapter 410 of the laws of 1882, was passed July 1, 1882. It was not a new body of law. Its title describes it as " An act to consolidate into one act, and to declare the special and local laws effecting public interests in the city of New York." By section 2143, it was provided that it should take effect on the 1st day of March, 1883. In 1883, section 2143 was amended (chapter 276 of the laws of 1883), but the original and amended sections contained this provision : "For the purpose of determining the effect of this act upon other acts, except the Penal Code," and the effect of other acts, except the Penal Code upon this act—" this act is deemed to have been enacted on the 1st day of January, 1882, all acts passed after such date *and the Penal Code*, are to have the same effect as if they were passed after this act." The legislature thereby plainly declared that the Penal Code, in respect to the Consolidation Act, should be a subsequent act.

II. It will be observed that section 72, Penal Code, not only includes judicial officers, but *any person executing the functions of a public office*, not designated in Titles VI and VII, and also a person employed by or acting for the State, or any public officer in the business of the State. It is obvious that in this section are included all of the officers designated in the act of 1853 (chapter 539), and not specified in Titles VI and VII of the Code, and also all of the officers designated in the act of 1869 (chapter 742). The act of 1853, included "Any member of the common council or corporation of any city in this State, or any mayor, recorder, chamberlain, treasurer or comptroller, of such city, or any other officer of such city or of any department of the government thereof." The act of 1869, included " Any person holding office under the laws of this State." " It is a cardinal and controlling maxim that where a law antecedently to revision of the statutes is settled, either by the clear expression of the statutes, or adjudications on them, the mere change of phraseology evidently purports no intention in the legislature to work a change." *Sedg. Stat.* p. 365 (2d ed.) The

legislature did not certainly intend to exclude from the statute against bribery all those officers who had been designated in previous laws; but, on the contrary, pursuing the general policy of the State, to make even broader, more sweeping and more rigorous provisions.

III. The rule that a local statute is not repealed by a later general statute, even though the general law contains a general repealing clause as to inconsistent legislation, is subject to the qualification that where there is a manifest intent to repeal the former local statute, derivable either from the provisions of the general law, or because the two acts are so repugnant and inconsistent that they cannot be reconciled, the later statute prevails. *Potter's Dwarris Statutes*, 155; Heckmann *v.* Pinckney, 81 *N. Y.* 211. And even though the latest statute is not entirely repugnant to a prior one, if it was intended to furnish the only rule in the case, the prior statute is repealed. Heckman *v.* Pinkney, *supra.*

IV. When the legislature promulgated the Penal Code there were three cities, at least, where the same crime by the same class of officers was punished by different penalties, and there were several other cities where there were no charter provisions regulating such an offense, and whose officers, if punishable at all, were amenable only to the general State law. The general law, even before the Penal Code, was broad enough to include every person holding office under the laws of the State, whether a municipal officer or not. To abolish such inconsistencies of legislation as above shown, and to provide an even and equal punishment for the same crime in all parts of the State the Penal Code was enacted. It was the purpose of that Code to provide the only rule for the punishment of the same offense in whatever part of the State committed. Sections 2, 7, 11, 719.

Where a new statute covers the whole subject matter of an old one, and adds offenses and prescribes different penalties from those enumerated in the old law, it is, by necessary implication, a repeal of the former statute. Norris *v.* Crocker, 13 *How.* (*U. S.*) 429; Rex *v.* Cator. 4 *Burr*, 2026; Nichols *qui tam v.* Squire, 5 *Pick.* 168; Commonwealth *v.* Kimball, 21 *Id.* 373; Adams *v.* Ashby, 2 *Bibb.* 96; State *v.* Whitworth, 8 *Porter's*

*Ala. Rep.* 434; Heckmann *v.* Pinkney, 81 *N. Y.* 215; Farr *v.* Brackett, 30 *Vt.* 344; Wakefield *v.* Phelps, 37 *N. H.* 295; D. L. Plank Road Co. *v.* Allen, 16 *Barb.* 15; Daviess *v.* Fairbairn, 3 *How.* (*U. S.*) 636; People *v.* Gold & Stock Telegraph Co. 98 *N. Y.* 78; see, also, U. S. *v.* Tynen, 11 *Wall.* 88; Sacramento *v.* Bird, 15 *Cal.* 294; Swann *v.* Buck, 40 *Miss.* 268; Weeks *v.* Walcott, 15 *Gray*, 54; cases cited in *Sedgwick on Statutes* (2d ed.) p. 100, note.

The intention of the legislature to repeal the prior local statute is not only manifest from the above reasoning, but it is expressed in the Penal Code itself. Sections 2, 7, 11 719, and 726.

The Consolidation Act, in express words, makes the Penal Code a later statute than the Consolidation Act. Section 72 of the Penal Code is a law subsequent to section 58 of the Consolidation Act. Any other interpretation than that contended for leads to manifest absurdity and oppression, in that different punishment, for the same offense, committed in different cities of the State, would be imposed upon officers of the same grade.

V. The test of the admissibility of confessions, as defined in section 395 of the Code of Criminal Procedure, is whether they were made " under the influence of fear, produced by threats, or upon a stipulation of the district attorney that the defendant should not be prosecuted therefor." All other confessions, however procured, are admissible. People *v.* Wentz, 37 *N. Y.* 303; People *v.* Cox, 80 *Id.* 500; People *v.* McGloin, 1 *N. Y. Crim. Rep.* 154; People *v.* McCallam, 3 *Id.* 19; People *v.* Chacon, *Id.* 419.

VI. The defendant's confessions having been proved, additional evidence was required before a conviction could be had. It was not necessary that that additional evidence should be direct. It was sufficient if it was circumstantial only. In other words, any and all facts and circumstances, which proved in any degree, however slight, to strengthen, corroborate, and render more probable the confession, were competent. The test of the admissibility of any fact, was this: *Does it tend to show the truth of the confession?* If that was its legitimate

effect it was relevant; it was not *res inter alios*, but a part of the *res gestæ.* People *v.* Carr, 3 *N. Y. Crim. Rep.* 578; State *v.* Guild, 5 *Halst. N. J. L. R. Bishop Crim. Pro. and Ev.* vol. 1, § 1058, says: "Confessions alone, uncorroborated by other evidence, are inadequate to establish the *corpus delicti.*" To say that they are INADEQUATE ALONE to establish the *corpus delicti,* implies that they are SOME evidence of the *corpus delicti.* And to say in the language of the Code, that they are not "sufficient to warrant conviction without ADDITIONAL proof that the crime charged has been committed," means that the confessions are SOME proof that the crime charged has been committed. Section 395, Code of Criminal Procedure, was construed in the following well-considered cases: People *v.* Kelly, 3 *N. Y. Crim. Rep.* 414· People *v.* Carr, 3 *Id.* 578; People *v.* Mondon, 4 *Id.* 1.

ANDREWS, J.—The principal question upon this appeal is, whether the crime of bribery committed by a member of the common council of the city of New York, is punishable under the Penal Code, or only under the New York City Consolidation Act of 1882. The materiality of the question presented lies in the fact that the defendant was indicted and convicted of bribery, as a member of the common council of the city of New York, under section 72 of the Penal Code, and was sentenced to imprisonment in the State prison for the term of nine years and ten months, pursuant to the provisions of that section, whereas, if he was punishable only under the Consolidation Act of 1882, the maximum punishment by imprisonment could not have exceeded two years in the penitentiary.

After a careful consideration we have reached the conclusion that section 58 of the Consolidation Act is superseded by section 72 of the Penal Code, and that the crime of bribery committed by a member of the common council of the city of New York, is defined and made punishable by that section. In determining this question it is to be assumed that the Penal Code was the later enactment, although in point of fact it was passed prior to the Consolidation Act. The Penal Code was passed July 26, 1881, and took effect December 1, 1882. The

Consolidation Act was passed July 1, 1882, and took effect March 1, 1883. But section 2143 of the Consolidation Act expressly declares, that "for the purpose of determining the effect of this act upon other acts, except the Penal Code, and the effect of other acts, except the Penal Code, upon this act, this act is deemed to have been enacted on the first day of January, in the year 1882. All acts passed after such date, and the Penal Code, are to have the same effect as if passed after this act." By the express prescription of the legislature, therefore, the Penal Code, although enacted before the Consolidation Act, is to have the same effect upon the Consolidation Act as if it had been passed after that act. This provision, although somewhat anomalous, does not, as we can perceive, transcend the legislative power. It subordinates the Consolidation Act to the Penal Code wherever the two statutes are in conflict, and moreover, what is material to notice, the provision affords the plainest implication that in the sense of the legislature there were, or might be, penal provisions in the Consolidation Act in conflict with the Penal Code. For the purpose of construction the legislature has declared in what order of time the two statutes shall be deemed to have been enacted, and there being no question of legislative power, it is the plain duty of courts to construe the two statutes in accordance with this direction.

Section 58 of the Consolidation Act is a re-enactment of section 100 of the charter of 1873, which in turn was a re-enactment of section 114 of the charter of 1870. It is sufficiently specific for our present purpose to state that the section makes it a felony for any person to *give or promise* to any member of the common council or any municipal officer, any *money or valuable thing* with intent to *influence his official action,* or for any such *officer to accept any such gift or promise under any agreement or undertaking that his vote, opinion, judgment or action shall be influenced thereby,* and subjects the bribe-giver, upon conviction, to imprisonment in the penitentiary for a term not exceeding two years, or to a fine not exceeding five thousand dollars, or both, in the discretion of the court, and the bribe-giver, on like conviction, to the same punishment by fine

or imprisonment, or both, and in addition subjects him to a forfeiture of his office, and disqualifies him from holding any office under the city of New York.

Section 72 of the Penal Code is in the following language: "Sec. 72. A judicial officer, a person who executes any of the functions of a public office not designated in titles 6 and 7 of this Code, or a person employed by or acting for the State or for any public officer in the business of the State, who *asks, receives or agrees to receive a bribe, or any money, property, or value of any kind or any promise or agreement therefor, upon any agreement or understanding that his vote, opinion, judgment, action, decision, or other official proceeding, shall be influenced thereby*, or that he will do or omit any act or proceeding, or in any way neglect or violate any official duty, is punishable by imprisonment for not more than ten years, or by a fine of not more than five thousand dollars, or both. A conviction also forfeits any office held by the offender, and forever disqualifies him from holding any public office under the State."

It is material at the outset to inquire whether the offense of bribery committed by municipal officers is, as a general rule, embraced and punishable under this section of the Penal Code. If the section does not apply to the bribery of the municipal officer in any case, then plainly there is an end of the argument in support of his conviction. If, on the other hand, the section applies in general to this class of officers, then it becomes necessary, in order to reverse the conviction, that it should be found that the special case of bribery committed by municipal officers in the city of New York is excepted, or in some way taken out of the operation of this section. The comprehensive character of the provisions of the Penal Code relating to bribery, both in respect to the definition of the offense and the officers by whom it may be committed, is apparent upon the most cursory reading. They form to a great extent the subject of three titles: Title 6 relates to crimes against the executive power of the State, and prescribes the punishment for giving or offering bribes, or for the asking and receiving of bribes by executive and administrative officers. Title 7 relates to crimes against the legislative power of the State, and contains provisions

for the punishment of bribery of members of the legislature. Title 8 is entitled "of crimes against public justice." Section 71 prescribes the offense of giving or offering a bribe to a judicial officer and certain other persons enumerated, connected either with the administration of justice or who exercise *quasi* judicial functions. Section 72, which prescribes the offense of receiving bribes, is not thus limited. It specifies judicial officers, but the specification is followed by words of the most comprehensive meaning, intended apparently to include in this final provision all public officers within the State, of whatever character or grade, *not included within the previous titles.* It in terms, not only embraces a judicial officer, but also "a person who executes any of the functions of a public office" not designated in titles 6 and 7.

That it was not the intention to confine the section to judicial officers is manifest also from the subsequent designation in the same section of "a person employed by or acting for the State, or for any public officer in the business of the State," and also from section 78, which supplements section 72, and prescribes the offense of giving or offering a bribe to "a person executing the functions of a public officer," although the bribery of a judicial officer is specially provided for by section 71.

It is plain that a member of a common council or other municipal officer is a person "who executes the functions of a public office, and we cannot doubt that municipal officers are within the purview of section 72. If this was less plain or the language of the section itself, there are cogent reasons for giving it this construction, in view of the antecedent legislation and the presumed intention of the legislature. A reference to the successive statutes on the subject of bribery, commencing with the statute, chapter 181 of the laws of 1806, re-enacted by the revised laws of 1813, shows a constant tendency on the part of the legislature to extend the statutes against bribery to persons not embraced in previous laws. The statute of 1806 included only State officers and members of the Senate and Assembly. The Revised Statutes (2 *Rev. Stat.* 760), enlarged the enumeration of State officers in the previous statutes, and for the first time included judicial officers. The amendment

of 1853 (chapter 539), still further extended the enumeration to "any member of the common council or corporation of any city in the State, or to the mayor, recorder, chamberlain, treasurer, or comptroller of such city, or any department of the government thereof."

The act of 1869 (chapter 742), departed from the practice of special enumeration adopted in the previous statutes, and substituted words of general description, " any persons holding office under the laws of this State," and the law of 1869 was in force until the enactment of the Penal Code. It will be noticed that the members of a common council were specially included in the act of 1853, and there can be no reason to suppose that when, in 1869, the legislature substituted a general and comprehensive description in place of a specific enumeration, it intended to exempt municipal officers from the operation of the statute of bribery. It would seem, moreover, that there could be no general policy upon which an omission of municipal affairs from the provisions of the general statute against bribery, could proceed.

The cities of the State embrace a large charge of its population and wealth. Municipal governments exercise by delegation, within a limited sphere and under certain restrictions, sovereign power. They create debts binding upon the municipality and wield the power of taxation. The dangers to which public rights and private property are exposed from dishonest municipal administration, are certainly as great as from corruption on the bench or in the legislature. It is inconceivable that a bribery statute of general application should be enacted, which did not embrace bribery of municipal officers. We find no difficulty in reaching the conclusion that section 72 of the Penal Code, applies in general to the offense of bribery committed by municipal officers.

We are therefore brought directly to the main question whether section 58 of the Consolidation Act, is in force and takes the case of bribery, when committed by a member of the common council of the city of New York, out of the operation of section 72 of the Penal Code, thereby requiring a different procedure and a different punishment in the special case,

from that prescribed by the general law governing the same offense when committed by a member of a common council in other cities of the State.

The Penal Code, as its title implies, is an institute of criminal justice of general application, and was enacted in harmony with the tendency of recent legislation, for the purpose of embodying in a single statute the system of criminal law applicable to the State, and substituting the statute so enacted in place of the great number of statutes and amendments of statutes which, together, before the enactment of the Code, constituted the body of the criminal law.

In the seventh section it declared that " this Code specifies the classes of persons who are deemed capable of crimes and liable to punishment; the nature of the various crimes; and prescribes the kind and measure of punishment to be inflicted for each,' and it is declared in the second section that " no act or omission begun after the beginning of the day on which the Code takes effect as a law, shall be deemed criminal or punishable, except as prescribed or authorized by the Code, or by some statute of this State not repealed by it." It is a plain inference from these provisions that the Penal Code was intended as a revision of the prior laws in respect to crimes and their punishment and as a substitute for the scattered and fragmentary legislation which preceded it. The Penal Code contains no general clause repealing prior statutes covering the subjects embraced in its provisions. It, however, defines and prescribes the punishment for murder, larceny, burglary and all the generally recognized offenses, and it cannot be doubted that its provisions on these subjects were intended as a substitute for similar provisions in the prior laws.

On comparing the offense of bribery, as defined by the Consolidation Act and by section 72 of the Penal Code, it will be found that all the elements of the crime as defined in the Consolidation Act, are included in the definition of the same crime in the Penal Code, although the definitions in the two statutes are not indentical in language. By the Consolidation Act every officer enumerated therein " who shall *accept* a gift or promise," etc., with the agreement or understanding that his

vote or action shall be influenced thereby, is declared guilty of a felony.    By section 72 of the Penal Code, the words "receives or agrees to receive," etc., are used in place of those in the Consolidation Act.    But the words in both statutes are of equivalent meaning.

It was assumed on the trial that the indictment was found under the provisions of the Penal Code.

In point of form we think the indictment was good under either statute.    It is not necessary that an indictment should follow the precise language of a statute, but words of equivalent import are sufficient, and this rule of the common law is now declared by statute (*Code Crim. Pro.* § 283).    We have then, *first,* a special provision in the charter of the city of New York, making bribery committed by a city officer a crime, and declaring its punishment, and, *next,* a general law later in date (for so it must be deemed), containing provisions defining with great minuteness the crime of bribery by executive, legislative and judicial officers, and in the final section including "every person executing the functions of a public office."

The learned counsel for the defendant insists that the two acts are not necessarily repugnant, and they invoke the application to this case of the general rule in respect to the repeal of statutes by implication, that a posterior general act does not repeal a prior local act, unless the legislative intent to repeal be unequivocally apparent.    Whether a subsequent statute repeals a prior one in the absence of expressed words, depends upon the intention of the legislature, and one of the tests frequently resorted to to ascertain whether there is a repeal by implication, is to inquire whether the special and general acts may both be executed without involving repugnancy of rights or remedies. In some cases the question has been solved by holding that the general act was intended to declare a general rule governing cases not already provided for, and that a prior special statute on the same subject, operating upon a single person or class of persons, or within a limited territory, should be treated as if specially excepted from the operation of the general law.    It will be found, I think, on examining the cases in which the courts have held that a special law was not repealed by a sub-

sequent general law on the same subject, that they are as a general rule cases where the legislature was not dealing directly with the subject of the prior law, and it was not in the mind of the legislature when the general law was enacted; or where the special law was part of a system of local administration; or where it was possible to assign a reasonable motive for retaining the special and peculiar provisions of the special act, notwithstanding the enactment of a subsequent general rule governing the same subject. The general bribery act not only covers the whole subject, but was, we think, plainly intended to furnish the only rule governing the crime and punishment of bribery. It includes by enumeration and description all officials of every grade, town, city, county and State officers; provides a uniform punishment, but gives to the court a discretion in applying it within the limit prescribed, to meet the circumstances of the particular case.

The crime of bribery is not local, affecting only a particular locality. No matter in what place the crime is committed, or whether by a town, city, county or State officer; it is an offense in the punishment of which the whole public are interested. It is peculiarly a crime against society at large. It impairs public confidence in the integrity of official administration, a confidence most necessary to be maintained. It is impossible to suppose that the legislature, when it enacted the Penal Code, intended to exempt officials in the city of New York from the operation of the bribery sections. No public policy can be assigned for such a discrimination, and we think the case is within the rule that "a later statute, covering the same subject-matter and embracing new provisions, operates to repeal the prior act, although the two acts are not in express terms repugnant." See Norris *v.* Croker, 13 *How.* (*U. S.*), 429; Bartlet *v.* King, 12 *Mass.* 545; United States *v.* Tyne, 11 *Wall.* 88; Heckmann *v.* Pinkney, 81 *N. Y.* 215; People *v.* Gold and Stock Telegraph Co. 98 *Id.* 78.

The construction we have given to the Penal Code in connection with the Consolidation Act is greatly strengthened, in view of the inconsistencies which would result from holding

that section 58 of the Consolidation Act is still in force. At the time of the enactment of the Penal Code, the charters of the cities of New York, Brooklyn and Long-Island City contained provisions for punishing bribery committed by municipal officers in those cities. *Laws* 1873, chap. 535, § 100; *Id.* chap. 863, tit. 19, § 22; *Laws* 1871, chap. 760. But no such provisions were contained in the charters of Albany, Poughkeepsie, Troy, Syracuse, Rochester, Buffalo or Elmira.

The general bribery act of 1869, which was in force until the enactment of the Penal Code, made bribery a crime when committed by "any person holding office under the laws of this State." The statute of 1869 was unquestionably superseded by the provisions of the Penal Code. Unless, therefore, municipal officers are punishable for bribery under section 72, it follows that bribery committed by municipal officers in New York, Brooklyn and Long Island City is punishable under the special provisions of the charters of these cities, but it is not an offense, and is not punishable when committed by officers of the same class in the other cities of the State.

If, on the other hand, section 72, as we have endeavored to show, includes municipal officers, the contention that, nevertheless, the crime and punishment of bribery by municipal officers in the city of New York is still governed by section 58 of the Consolidation Act leads us to an equally absurd result. It involves the necessity of ascribing to the legislature an intention to discriminate in the punishment of bribery when committed by a municipal officer in the city of New York and when committed by municipal officers in other cities; and also the further intention to punish the crime when committed in the smaller municipalities with far greater severity than when committed by municipal officers of the most populous and important city in the Union. Such legislation is absurd in theory, and leads to injustice. It regulates punishment according to the locality of the crime, instead of by the nature of the offense. It is repugnant to the principle that laws should be equal and impartial, and ignores a natural sentiment which requires even-handed justice, even in the punishment of crimes. A law punishing homicide in the city of New York by imprisonment in the

State prison and in Brooklyn by hanging, would shock the general sense, but would not be different in principle from a law punishing bribery in one city by imprisonment in the penitentiary for two years and in the other by imprisonment in the State prison for ten years.

It is the duty of courts in construing statutes, to avoid, if possible, a construction which leads to absurdity or manifest injustice, and the case before us calls for the application of this principle. The fact that prior to the Penal Code the same inconsistency existed between the punishment for bribery under the charter provisions, and the general bribery statute, does not, we think, make it less the duty of the court to seek to place such a construction upon the Penal Code, as will remedy such an anomalous and unsatisfactory condition of the law. The argument so far has proceeded upon the assumption that the Penal Code contains no express provision, saving the bribery provision in the Consolidation Act from its operation. But it is claimed by the counsel for the defendant that section 58 of the Consolidation Act is continued in force by section 725 of the Penal Code. That section is as follows : " § 725. Noth. ing in this Code affects any of the provisions of the following statutes; but such statutes are recognized as continuing in force, notwithstanding the provisions of this Code, except so far as they have been repealed by subsequent laws: 1. All acts incorporating municipal corporations, and acts amending acts of incorporation, or charters of such corporation, or providing for the election or appointment of officers therein, or defining the powers or duties of such officers; 2. All acts relating to emigrants or other passengers in vessels coming from foreign countries, except as provided in section 626 of this Code; 3. All acts for the punishment of intoxication or the suppression of intemperance, or regulating the sale or disposition of intoxicating or spirituous liquors; 4. All acts defining and providing for the punishment of offenses not defined and made punishable by this Code." The claim is that this section excepts from the operation of the Penal Code, all penal provisions in charter acts, and that as section 58 of the Consolidation Act is a penal provision of that character, it is excepted from the

operation of the Penal Code. Notwithstanding the generality
of the language of section 725, it is apparent from other pro-
visions, both of the Consolidation Act and of the Penal Code,
that it was not intended that all penal provisions in charter acts,
should remain in force unaffected by the Penal Code. The
provision in section 2143 of the Consolidation Act, that the
Penal Code should have the same effect upon the Consolida-
tion Act, as if it was passed after that act, has no significance
except upon the assumption that in the sense of the legislature,
the Penal Code contained provisions which, if deemed to have
been enacted after the Consolidation Act, would, or might mod-
ify the penal clauses in that act. Moreover, it was the evident
intention of the legislature to establish by the Penal Code a
uniform rule of punishment for crimes of the same grade
throughout the State. It is enacted in section 719, that an
offense specified in the Code, committed after it has taken
effect, must be punished according to the provisions of this
Code and not otherwise."

The claim that section 725 was intended to apply to and pre-
serve unimpaired all penal provisions in charter acts, is clearly
disproved by section 726. That section, which contains the
only express repealing provisions in the Code is as follows:
" § 726. All acts and parts of acts which are inconsistent with
the provisions of this act, are repealed so far as they impose
any punishment for crime, except as herein provided." The
true meaning of the phrase, "except as herein provided,"
would, I apprehend, have been more clearly expressed by the
words, "other than as herein provided." The Consolidation
Act does impose a punishment for bribery, inconsistent with
that prescribed by the Penal Code, and section 726, if it goes
no further, clearly conforms the punishment for bribery under
the Consolidation Act, to that prescribed by the Penal Code,
and so to that extent, effects the charter provision. In this view
it is not very material whether section 58 is regarded as wholly
repealed, or only as modified in respect to the punishment. If
modified only, the result would be that there are two statutes
identical in substance, both as respects the definition of the
crime and its punishment, under either of which an indictment

would lie, a judgment under one barring proceedings under the other. But we are of opinion that section 725 is to be construed as saving only those penal provisions of charter acts which are not covered by the provisions of the Penal Code, and this limitation of the generality of the language of that section is required, upon construing it in connection with other provisions, and in view of the general purpose of the legislature in enacting the Penal Code, to consolidate into one Crimes Act the various statutes relating to crimes, and to prescribe a uniform rule of punishment.

The main evidence produced on the trial to sustain the charge of bribery was that of a police inspector and other police officers, who testified to confessions of the defendant. It did not appear that they were made under the influence of fear produced by threats, or upon any stipulation for immunity from prosecution, so as to make them inadmissible under section 395 of the Code of Criminal Procedure. But it is claimed that there was no proof in addition to the confessions, as required by the statutes, to warrant a conviction. By section 395 of the Code of Criminal Procedure, it is declared that the confession of a defendant "is not sufficient to warrant a conviction without additional proof that the crime charged has been committed." There was evidence given on the trial showing that the Broadway Railway grant was passed under circumstances which, while they may possibly have been consistent with an innocent intention on the part of the defendant and others, nevertheless, indicated the operation of unusual motives and influences, and when interpreted in the light of the confession, are strongly corroborative of its truth. It is insisted that under the statute the *corpus delicti* must be proved, or evidence given tending to prove it, wholly independent of the confession, and that no evidence was given which, disconnected from the confessions, had a tendency to prove the body of the crime. It would be a sufficient answer to this point that it is not raised by any exception on the trial, and it clearly was not raised by the exception to the denial of a motion for a new trial, made after verdict. But we are of opinion that when, in addition to the confession, there is proof of circumstances

which, although they may have an innocent construction, are, nevertheless, calculated to suggest the commission of crime, and for the explanation of which the confession furnishes the key, the case cannot be taken from the jury for a non-compliance with the requirement of the statute. The words of the statute, "additional proof that the crime charged has been committed," seem to imply that the confession is to be treated as evidence of the *corpus delicti*, that is, not only of the subjective criminal act, but also the criminal agency of the defendant, in other words, as competent proof of the body of the crime, though insufficient without corroboration to warrant a conviction. "Full proof," said NELSON, Ch. J., in People *v.* Badgley (16 *Wend.* 59), "of the body of the crime, the *corpus delicti*, independently of the confession, is not required by any of the cases, and in many of them slight corroborating facts were held sufficient." We are of opinion that there was evidence in addition to the confession which constituted "additional proof" within the statute.

We have examined the other questions raised, but have reached the conclusion that no error is disclosed in the record, and that the judgment should be affirmed.

The case was carefully tried. No evidence in favor of the defendant was excluded, and none admitted against him of doubtful competency. The charge was full and explicit upon all points to which the attention of the court was directed. We have been greatly aided in our examination of the case, by the arguments of the respective counsel, from which nothing on either side was omitted, legitimately bearing upon the question presented.

The judgment should be affirmed.

RUGER, Ch. J., MILLER, DANFORTH and FINCH, JJ., concur.

RAPALLO, J. (dissenting).—The important question in this case is, whether the offense of which the prisoner was convicted was punishable under section 72 of the Penal Code, or under section 58 of the Consolidation Act of 1882.

Section 72 of the Penal Code provides as follows:

"A judicial officer, a person who executes any of the functions of a public office not designated in titles 6 and 7 of the Code, or a person employed by or acting for the State or for any public officer in the business of the State, who *asks, receives,* or *agrees to receive a bribe,* or any money, property or value of any kind, or any promise or agreement therefor, upon any agreement or understanding that his vote, opinion, judgment, action, decision, or other official proceeding shall be influenced thereby, or that he will do or omit any act or proceeding, or in any way neglect or violate any official duty, is punishable by imprisonment for not more than ten years or by a fine of not more than five thousand dollars or both. A conviction also forfeits any office held by the offender and forever disqualifies him from holding any office under the State."

This Code was passed July 26, 1881, and section 727 declares:

"This act shall take effect on the 1st day of December, 1882. When construed in connection with other statutes, it must be deemed to have been enacted on the 4th day of January, 1881, so that any statute enacted after that day is to have the same effect as if it had been enacted after this Code."

The Consolidation Act was passed July 1, 1882, and is entitled "An act to consolidate into one act, and to declare the special and local laws affecting public interests in the city of New York." It contains the charter of the corporation and provides for the local government of the city. It continues the board of aldermen and the various departments of the city government.

Section 58, so far as relates to the question now at issue, is in the following words:

"Sec. 58. Every person who shall promise, offer, or give, or cause or aid, or abet in causing to be promised, offered or given, or furnish or agree to furnish in whole or in part, to any other person to be promised, offered or given to *any member* of the *common council,* or any officer of the corporation, or clerk, after his election or appointment as such officer, member, or clerk, or before or after he shall have qualified and taken his seat, or entered upon his duty, any moneys, goods, right in action, or

other property, or anything of value, or any pecuniary advantage, present or prospective, with intent to influence his vote, opinion judgment or action, on any question, matter, cause or proceedings which may be then pending, or may by law be at any time brought before him in his official or clerical capacity, shall be deemed guilty of a felony, and shall upon conviction, be imprisoned in a penitentiary for a term not exceeding *two* years, or shall be fined not exceeding five thousand dollars, or both, in the discretion of the court.

"*Every officer in this section enumerated who shall accept any such gift or promise, or undertaking* to make the same under any agreement or understanding, that his vote, opinion, judgment or action, shall be influenced thereby or shall be given in any question, matter, cause or proceeding then, or at any time pending, or which may by law be brought before him in his official capacity, shall be deemed guilty of a felony, and shall upon conviction be disqualified from holding any public office, trust or appointment *under the city of New York*, and shall forfeit his office, and shall be punished by imprisonment in the penitentiary not exceeding two years or by a fine not exceeding five thousand dollars, or both, in the discretion of the court."

The prisoner was indicted for the crime of bribery committed by him in August, 1884, as a member of the common council of the city of New York. It was assumed upon the trial that one count of the indictment was framed under section 72 of the Penal Code and the other under section 58 of the Consolidation Act. On the trial, the court, on motion of the counsel for the prisoner, required the district attorney to elect upon which count of the indictment he would proceed, and thereupon the district attorney stated that he elected to go to trial on the first count, under section 72 of the Penal Code.

The counsel for the prisoner thereupon moved to dismiss the indictment or direct an acquittal on the ground that no conviction could be had under that count. The motion was denied and an exception taken and the trial proceeded.

The jury rendered a verdict of guilty. A motion in arrest of judgment was made and denied, and the prisoner was then

sentenced to be imprisoned in the State prison, at hard labor, for the term of nine years and ten months.

It will be observed that the Penal Code is a general statute, operative throughout the State, and that section 72 provides for the punishment of the crime of bribery committed by any person who executes any of the functions of a public office not desig-. nated in titles 6 and 7 of the Code (which relate to State officers and fixes the maximum punishment at imprisonment in the prison for ten years and $5,000 fine, or both, while section State 58 of the Consolidation Act is a local act, applying only to the city of New York, and relates only to a special class of officers, viz., members of the common council of said city, officers of the corporation and clerks, and fixes the maximum punishment for the crime committed by such officers at imprisonment in the. penitentiary for two years and $5,000 fine, or both.

The Penal Code, as has been stated, was passed in July, 1881, and the Consolidation Act in July, 1882.

The Consolidation Act provides for the punishment of the same crime for which the prisoner was indicted; he was one of the officers specially referred to in that act, and it being the later statute in point of time, would unquestionably control. where it differed from the Penal Code, and the present controversy would never have arisen but for a peculiar provision of the Consolidation Act, contained in section 2143 of that act, in the following language: "For the purpose of determining the effect of this act upon other acts, except the Penal Code, and the effect, of other acts, except the Penal Code, upon this act, this act is. deemed to have been enacted on the 1st day of January, 1882.

"All acts passed after such date, and the Penal Code, are to have the same effect as if they were passed after this act.

"This act shall take effect on the 1st day of April, 1883."

The effect of this section is the question now before us. It, is claimed on the part of the prosecution that the provisions of section 58 of the Consolidation Act, are inconsistent with those of section 72 of the Penal Code, and that section 2143, by declaring that the Penal Code, although in fact passed first, is, to have the same effect as if passed last, operates to repeal sec-

tion 58 of the Consolidation Act and to put in its place section 72 of the Penal Code.

This argument puts the legislature in the remarkable position of carefully framing and enacting the provisions of section 58, and in the same breath and by the same act, declaring that they shall have no effect whatever, but shall be deemed repealed and superseded by an act passed the previous year. Such a self stultification cannot be attributed to the legislature if there is any rational theory upon which its enactments can be reconciled.

In the first place it should be assumed that in giving to the Penal Code the position of the later statute, the legislature had in mind the familiar and firmly-established rule for the construction of statutes, that general legislation on a particular subject must give way to special legislation on the same subject, and that laws special and local in their application, are not deemed repealed or modified by general legislation on the same subject, although the terms of the general act are broad enough to include the cases embraced in the special law, unless the intent to change the local law is clearly manifested. *In re* Comm'rs of Central Park, 50 *N. Y.* 493; McKenna *v.* Edmundstone, 91 *Id.* 231; People *v.* Quigg, 59 *Id.* 88.

Whatever purpose the legislature may have had in view, therefore, in the enactment of section 2143, it is clear that it could not have been intended to operate as a repeal of section 58, for they well knew that even if the Penal Code had in fact been passed after the Consolidation Act, it would not have affected the provisions of section 58, which are special and local in their application, being applicable only to members of the common council and other municipal officers of the city of New York, and that to repeal these provisions, special reference to them, or some other manifestation of the intent to repeal them than merely giving to the Penal Code the position of the later statute, was necessary. They were not therefore guilty of the absurdity of enacting section 58, and inserting in the same act a provision which would prevent its operation.

But looking a little further into the subject we find that at the time of the passage of the Penal Code there was, and for many

years had been, in force a special local statute for the punishment of bribery of members of the common council and other municipal officers of the city of New York, which differed materially from the general law on the subject of bribery, and that this special local statute was not only unaffected by the Code, but was retained in force by an express provision of the Code itself. Prior to the adoption of the Penal Code the general provisions of law on the subject of bribery were contained in the act of 1853 (chapter 539), entitled "An act to amend the existing laws relative to bribery," and chapter 742 of the laws of 1869, entitled "An act for the more effectual suppression and punishment of bribery." The act of 1853 amended the Revised Statutes, and enumerated the various officers who might commit the crime, including the Governor, State officers, members of the legislature, judiciary, and also members of the common council or corporation of any city in this State, and imposed a maximum punishment on the offending officer of ten years imprisonment and $5,000 fine, besides forfeiture of office and disqualification. The act of 1869 was more general in its terms. It did not enumerate the officers, but applied to " any person holding office under the laws of this State," who should receive or consent to receive a bribe. It imposed upon the party convicted a maximum punishment of five years imprisonment in the State prison and $5,000 fine. It omitted the punishment of forfeiture of office and disqualification from holding office, which was contained in the Revised Statutes and in the act of 1853, and it contained this remarkable provision : "§ 2. No person who has heretofore paid or offered, or shall hereafter pay or offer a bribe to any person holding office under the laws of this State, which has been or shall be accepted in whole or in part, shall be liable to criminal prosecution therefor."

This was the general law of the State on the subject of bribery when the Penal Code was adopted, but at the same time there were in force special and local statutes on that subject applicable to members of the common council and other municipal officers of the city of New York and some of the other cities of the State, which differed from the general law.

The act to amend the charter of the city of New York (*Laws of* 1853, chap. 217, § 14) contained a provision substantially in the same form as section 58 of the Consolidation Act, making the acceptance of a bribe or of a promise of a bribe by any member of the common council or officer of the corporation a felony punishable by forfeiture of the office and disqualification from holding office under the city and by imprisonment in the State prison for ten years, or a fine of five thousand dollars, or both, thus conforming to the general law of 1853 on the subject of bribery.

The charter of 1857 (*Laws of* 1857, chap. 446), entitled "An act to amend the charter of the city of New York," section 52, re-enacted the foregoing provision of the charter of 1853, but reduced the maximum punishment to two years imprisonment in the penitentiary and $5,000 fine, besides being disqualified from holding any office under the city of New York. This was the first enactment which imposed a punishment for bribery on a member of the common council of the city of New York different from that established by the general law.

This provision was re-enacted in the charter of 1870 (*Laws of* 1870, chap. 137, § 114), and was again re-enacted in the charter of 1873 (*Laws of* 1873, chap. 335, § 100) in the same language, and was in force at the time of the passage of the Penal Code.

Thus it will be seen that for nearly twenty-five years before the passage of the Penal Code it had been the law under the charters of the city of New York that the maximum punishment which could be inflicted upon a member of the common council of that city for accepting a bribe, was two years imprisonment in the penitentiary and five thousand dollars fine, and a disqualification from holding any office or public trust under the city.

The general provision in the Penal Code for the punishment of bribery did not, under the general rule for the construction of statutes before adverted to, operate to repeal or alter this provision contained in the charter even if the Penal Code be treated as the last enactment. It would be assumed in conformity with that rule that the general law was not

intended to affect the local law unless the intention that it should affect it plainly appeared. But so far from there being any appearance of such an intention the precise contrary is made manifest by section 725 of the Penal Code, which provides:

"Sec. 725. Nothing in this Code affects *any of the provisions* of the following statutes; but such statutes are recognized as continuing in force notwithstanding the provisions of this Code, except so far as they have been repealed or affected by subsequent laws."

Then follows an enumeration of the laws not affected by the Code, which enumeration includes "all acts incorporating municipal corporations, and acts amending acts of incorporation or charters of such corporations."

In view of this plain provision of the Code, the legislature may well have adopted section 2143 of the Consolidation Act without deeming that by so doing they impaired any provision of the charter of the city of New York which was embraced in the Consolidation Act. The Penal Code was before the legislature when the Consolidation Act was passed, the Penal Code having been passed at a previous session; the difference between the punishment prescribed for bribery in that Code and in section 100 of the charter of 1873 and section 58 of the Consolidation Act was plainly apparent, but at the same time it was provided that nothing in the Code should affect *any* of the *provisions* of any charter or act amending the charter of a municipal corporation. It was obvious, in view of the saving clause, that had the Code been in fact passed after the Consolidation Act, it could have had no effect upon the provisions of section 58.

It is argued that it cannot be supposed that the legislature intended to provide for the punishment of the crime of bribery in one class of officers by one measure of punishment, and that for precisely the same offense they should prescribe a different punishment for a different class of officers. It is indeed difficult to assign a reason for making the distinction, and especially for making the punishment of bribery comparatively so light in respect to members of the common council of the city of

New York, when the magnitude of the interests controlled by that body is considered. But, nevertheless, the distinction has been made, and has existed ever since 1857 in the city of New York, and also in several other cities of the State. By the charter of Long Island City (*Laws of* 1871, chap. 471, title 2, § 1), any city officer found guilty of bribery or corruption is punishable by imprisonment in the State prison for a term not less than three nor more than ten years, or a fine of five thousand dollars, or both.

In this case it will be observed the provision is more severe than that of the general law, for it prescribes a minimum punishment of three years imprisonment.

By the act amending the charter of the city of Brooklyn (*Laws of* 1873, chap. 863, title 19, § 22), any member or officer of the common council, or any city officer receiving a bribe, is declared guilty of a felony, and punishable by imprisonment in the State prison for a term of not less than three nor more than five years.

These provisions clearly were left in force by the Penal Code, and after the passage of that Code, in the charter of the city of Albany, adopted in 1883 (*Laws of* 1883, chap. 298, title 18, § 6), a provision was inserted that any member of the common council or other officer of the city who should accept a bribe or a promise of a bribe, should be disqualified from holding office under the city of Albany, and be punished by imprisonment in the penitentiary not exceeding two years, or by a fine not exceeding five thousand dollars, or both, which provision is almost identical with section 58 of the Consolidation Act. There is no ground upon which it can be pretended that the provisions of that act are affected by the Penal Code, which took effect December 1, 1882.

The contention, that it was the policy of the legislature to provide a uniform punishment throughout the State for the crime of bribery, is not sustained by reference to its acts. It rather seems to have been the practice to pass local laws, operative in the several municipalities providing for the punishment of the municipal officers when guilty of bribery. Several ingenious arguments have been presented by the counsel for

the people for the purpose of avoiding the plain language of these statutes. It is urged that subdivision 1 of section 725 of the Penal Code, which declares that nothing in that Code affects any of the provisions of any act incorporating a municipal corporation or amending the charter of such corporation, is qualified by subdivision 4, of section 725, which enumerates among the statutes not affected by the Code "all acts defining and providing for the punishment of offenses not defined and made punishable by this Code." We fail to perceive how this provision affects subdivision 1. It is an additional exception and covers all enactments, though not contained in any municipal charter, which provide for the punishment of particular offenses not provided for in the Code.

The usual general repeating clause in section 726, of all acts and parts of acts inconsistent with the provisions of the Code, is also referred to. But that clause in a general law is not sufficient to repeal a special local law not referred to in terms, and which is capable of co-existing with the general law. Whipple *v.* Christian, 80 *N. Y.* 523, 526; *In re* Evergreens, 47 *N. Y.* 216, and other cases; *In re* Commissioners of Central Park, 50 *N. Y.* 493.

A provision affecting only a certain locality or a specfied class of persons is not necessarily inconsistent with a general law, but is an exception to it. The discussion of that question is, however, unnecessary when we find that the general law expressly ratifies and recognizes the exception.

The entire repealing section 726 reads as follows:

"Sec. 726. All acts and parts of acts which are inconsistent with the provisions of this act are repealed so far as they impose any punishment for crime, except as herein provided."

The words "so far as they impose any punishment for crime," are commented upon in support of the position that so much of the Consolidation Act as prescribes the punishment for bribery was intended to be embraced in the repeal. It is difficult to see how this could be when it is remembered that the Consolidation Act had not then been passed. But to meet that point it is sought to apply the language to the charter of 1873. This is equally impossible when we recall the provision of section

725, that *nothing* in the Code affects "any provision" of any charter act of a municipal corporation; and the concluding sentence of section 726 settles the question by declaring that inconsistent acts imposing punishment for crime are repealed, "except as herein provided," thus recognizing that some acts inconsistent with the Code imposing punishment for crime are excepted·from the repeal and are retained in force. The charter acts referred to come within this category.

The further ground is taken that section 100 of the charter of 1873 and section 58 of the Consolidation Act stand upon· the footing of a mere municipal ordinance created by the legislature and making that a crime against the corporation which in some of its features is also a crime against the State, and that consequently the general law against bribery is in full force, notwithstanding the special law relating to the city of New York.

This argument it is difficult to understand. If, under authority conferred by the legislature, an ordinance had been passed by the corporation for the punishment of an offense, there would be force in the suggestion that if the same offense were punishable under the general laws of the State they could be enforced and would not be superseded by the corporation ordinance. But the provision in question was not a corporation ordinance. It was a law of the State, enacted by the same authority as the Penal Code, and although affecting only particular local officers, had all the force with respect to crimes committed by them of a law of the State.

Our conclusion is that the judgment of the Supreme Court and of the Court of Oyer and Terminer must be reversed and a new trial ordered.

EARL, J. concurs.